HUGH WATSON, d/b/a EMPIRE STEEL, *et al.*, Plaintiffs-Appellees, *v.* AUBURN IRON WORKS, INCORPORATED, *et al.*, Defendants-Appellants.

(No. 73-110;

Second District—October 16, 1974.

Edmund M. Tobin and Rudnick, Wolfe, Snyderman & Foreman, both of Chicago, for appellants.

Mirabella, Facktor, Mirabella & Kincaid, of Wheaton, for appellees.

Mr. JUSTICE SEIDENFELD delivered the opinion of the court:

Plaintiff Hugh Watson, d/b/a Empire Steel, sued defendant Auburn Iron Works (here referred to as Auburn) claiming a mechanic's lien on property known as "Walnut Creek" in Count I, and seeking a money judgment from numerous other open jobs between the parties in Count II. During the trial, the court allowed the plaintiff to file a third amended complaint adding the general contractor, K. M. Knight Construction Co., as a party defendant. Following the trial, the court entered judgment on Count I against Auburn, the general contractor and other parties interested in the property in the amount of $4,027.29 and disallowed a counterclaim which had been filed by Auburn. The court entered judgment on Count II in favor of Watson against Auburn in the amount of $9,187.15. The defendants appeal.

Watson and Auburn had a long-standing working relationship prior to this dispute. Auburn would bid the jobs and orally sublet the steel erecting to Watson. In this case, Auburn submitted a bid for nine buildings in the "Walnut Creek" project. The bid contemplated that Auburn would fabricate the steel and Watson would erect the steel and bar joists. Watson's price quoted to Auburn was on the basis of the original bid for nine buildings.

However, the contract actually entered into by Auburn and K. M. Knight Construction Company, the general contractor, was for steel work for only three buildings at a price of $58,890. Nonetheless Auburn and Watson orally agreed that Watson should do the steel erecting, receiving payment by monthly installments for floors completed. Watson testified that he believed the contract price to be $33,000, plus extras. Anthony Petro, the owner of Auburn, however, set the contract price at approximately $25,000.

Watson began performance on April 7, 1970. He testified to his belief that well after the start of the performance the three buildings were to be only the first phase of the nine-building project but that he was thereafter informed that the three buildings were all that were contemplated. Watson continued to do substantial work until June 8, 1971, when further work was suspended pending receipt of payment for work completed. He had received no monthly installments to that date.

Anthony Petro, president of Auburn, testified by contrast that non-payment was not the main reason why plaintiff walked off the job. He testified that Watson told him that he was tired of the job and wanted out and had complained that the job conditions were not right, and, also, that Watson told him that he had been unsuccessful in obtaining the approval of the general contractor and the architect for the performance of extras. At the time of the suspension of work, Watson had completed only 20% of the work with expenditures of $9,898.50.

While Watson was off the job, Auburn hired another erector who worked until plaintiff resumed work on July 22, after receiving a partial payment of $2,500. Watson's only other receipts of payment were $1,500 on August 18 and $3,000 on September 2.

On September 10, Auburn was notified by telegram that the erection was not acceptable, and on October 6, notice was given that the erector's portion of the contract was terminated. Nonetheless, Watson worked until October 7, when the general contractor dismissed him from work. There was disputed testimony as to the quality of plaintiff's work.

After October 7, another company was called in to complete the steel erection. The total paid to steel erectors for the job, other than that paid to the plaintiff, amounted to $25,376.

The trial commenced in January of 1972. The general contractor was subpoenaed to testify as a witness and during this portion of the case, defendants moved to dismiss for failure to join the contractor as a party defendant. The motion was denied and at this time plaintiff was allowed to file a third amended complaint and issue summons against the general contractor as a defendant. All defendants were allowed 28 days to plead concerning the amended complaint and the trial was reconvened on April 19, 1972.

As to Count I, defendants contend that plaintiffs had no damages, that the court erred in failing to dismiss the complaint upon defendants' motion for failure to join the general contractor as a party defendant before substantial progress in the trial, and in then proceeding with the trial, and that the court erred in denying Auburn's counterclaim based upon its charge that Watson had wrongfully walked off the job and in allowing the mechanic's lien. The sole issue raised as to Count II is the refusal of the court to detail its verdict which defendants claim cannot be explained on the evidence, and this issue is also raised as to Count I.

Defendants argue that under any legal theory used to measure damages plaintiff may not recover under Count I.

■■ Defendants argue that the proper measure of damages for breach of a construction contract is the difference between the cost of construction and the fair market cost of the agreed construction. (Citing *Ross*

*v. Danter Associates, Inc.* (1968), 102 Ill.App.2d 354, 370; *Bertram v. Bergquist* (1910), 153 Ill.App. 43, 45; *County of Schuyler v. Missouri Bridge and Iron Co.* (1912), 256 Ill. 348, 352-353.) However, in each of cited cases the contractor breached his contract by refusing to perform and the owner was suing. Here, the roles are reversed. The contract was breached by Auburn's nonpayment of monthly installments for work performed as per the contract. Consequently this particular measure of damages relied upon by the defendant is inapplicable.

Defendants claim that the court erred in finding that plaintiff had an excuse to walk off the job and in finding that plaintiff's rights were established as of June 8 rather than at the time of the termination on October 7 when the general contractor forced plaintiff off the job. Additionally, defendants argue that even if plaintiff had an excuse by virtue of Auburn's nonpayment of monthly installments, his resumption of work on July 22 either operated as a waiver or established the nonpayment as nothing more than an excuse to get out of a bad business deal.

■■■ Defendants' contentions are without merit. Auburn's failure to make monthly installments was properly viewed as a material breach establishing plaintiff's rights and entitling him to suspend work until payment was received. (*J. J. Brown Co. v. J. L. Simmons Co.* (1954), 2 Ill.App 2d 132, 143.) The facts reveal that plaintiff received $2,500 prior to resuming work on July 22. Subsequent payments were late, with $1,500 being received on August 18 and $3,000 received on September 2. Further, there was conflicting evidence regarding the character of plaintiff's performance notwithstanding the general contractor's termination of the erection contract on October 6. Under such circumstances, the resolution of the question of fault, which also disposed of defendant's counterclaim, was a matter properly made by the trier of fact. (*Edward Electric Co. v. Metropolitan Sanitary Dist.* (1973), 16 Ill.App.3d 521, 526.) The court's finding on this issue is affirmed on the record before us.

Defendants next argue that the measure of damages, even assuming plaintiff was wrongfully prevented from completing the contract, is one which puts the injured party in as good a position as he would have been put by full performance of the contract. (Citing *Ryan v. Miller* (1893), 52 Ill.App. 191, 194; Restatement of Contracts § 329, comment (a) (1932).) We find neither citation helpful to defendants under the particular circumstances of this case. Similarly, section 333 of the Restatement of Contracts, also cited by defendants, cannot provide the answer standing alone. Section 333 provides in substance that damages for part performance be limited to the contract price less partial payments received; but that the loss to plaintiff must be deducted where performance would have resulted in a loss, with the burden of proof

being on defendant to prove that the contract is a losing one. This section must be read in conjunction with section 346 of the Restatement of Contracts which appears specifically designed to govern damages for breach of a construction contract.

Section 346 of the Restatement of Contracts provides in pertinent part:

"(2) For a breach by one who has promised to pay for construction, if it is a partial breach the builder can get judgment for the installment due * * *; and if it is a total breach he can get judgment * * * for either

(a) the entire contract price and compensation for unavoidable special harm that the defendant had reason to foresee when the contract was made, less installments already paid and the cost of completion that the builder can reasonably save by not completing the work; or

(b) the amount of his expenditure in part performance of the contract, subject to the limitations stated in § 333."

■■ Here Auburn's failure to make the monthly installments was, in fact, treated by plaintiff as a total breach when plaintiff's men walked off the job on June 8. Plaintiff's action was proper since it has been held that the failure to make monthly progress payments when due is a material breach of a contract entitling plaintiff to suspend work until the overdue payments were made. *J. J. Brown Co. v. J. L. Simmons Co.*, (1954), 2 Ill.App.2d 132, 143.

With respect to the limitations on recovery, Comments g and h to Restatement of Contracts, section 346(2), offer guidance. Comment g provides:

"In order to put the builder in as good a position as he would have been in had the contract been fully performed, it is necessary to give him the full contract price less the amount that he saves by reason of the other party's repudiation. The amount so saved is the cost of completion of the work; but this is less simple than it appears. It is the cost of completion by a reasonably prudent person in the builder's own position that is to be deducted from the contract price, and not the amount that it would cost the defendant or third parties. He may have made advantageous subcontracts that will reduce his cost of completion; and they must be taken into consideration. If the builder has materials on hand as a result of his expenditure under the contract, the reasonable value of those materials is a part of the builder's cost of completion, so far as they would be used up in the process."

Comment h provides in pertinent part:

"* * * Damages, measured by the builder's actual expenditure

to date of breach less the value of materials on hand, plus the profit that he can prove with reasonable certainty would have been realized from full performance. This is a correct rule and is in fact the equivalent of the rule stated in Clause (a) of this Subsection, provided that all the elements that justly enter into the determination of cost of completion are considered in determining expected profits. The builder has a right to his expenditures as well as his profits, because payment of the full price would have reimbursed those expenditures in full and given him his profit in addition (see § 333). A verdict for his profit alone would leave him a very heavy loser in those cases where his performance is far advanced toward completion. If the builder cannot or does not prove the cost of completion or the profit that he would have made from full performance, he can get judgment for his expenditures in part performance, subject to the limitations stated in § 333."

■■ Applying these rules, the trial court may well have found that defendant failed to meet its burden of proving that plaintiff had a losing contract, despite the finding that plaint'ff had underbid the job. The evidence showed that plaintiff's original bid was on the basis of erecting steel for nine buildings rather than three; and it was only after work had begun that Auburn informed plaintiff that the contract was only for completion of three buildings. Further, no testimony appears in the record as to plaintiff's profit had the job progressed without breaches by defendant. Only plaintiff's projected expenses were estimated on the basis of his initial performance which was concededly plagued with delays and problems which inhibited progress. On our review of the whole record we conclude that the award of damages is supported by the evidence.

Defendants next contend that it was error to allow the general contractor to be joined after substantial proceedings had taken place and after the general contractor had already testified as a subpoenaed witness. They urge that this caused the general contractor substantial damage and prejudice by denying him the right to hear material testimony since witnesses were sequestered, and to cross-examine key witnesses during their initial testimony. They also argue that the contractor was thereby denied his right to pre-trial discovery and his right to counsel was inhibited since his choice was limited to somebody with experience or knowledge of the case.

■■ It is undisputed that the general contractor was a necessary party (see Ill. Rev. Stat. 1971, ch. 82, par. 28), and there is no dispute that the right to amend is not absolute and unlimited but is a matter left to the

proper exercise of discretion by the court. See *O'Neill v. Chicago Transit Authority* (1972), 5 Ill.App.3d 69, 72.

■■ We conclude that the amendment and joinder were properly permitted within the trial court's discretion. The final order of the trial court declaring a lien for $4,027.29 against all defendants, to be taken from funds held by the Chicago Title & Trust Company, as escrowee, resulted in no prejudice to the general contractor. The contractor was not denied the opportunity to call and examine witnesses and, in fact, did examine both Watson and Bernard Gossen (the president of one of the plaintiff corporations) as adverse witnesses. Nor do we find any real restriction on the right to counsel since the attorney for Auburn also filed an appearance on behalf of the general contractor and an additional attorney was called in as counsel after several witnesses had testified following the amendment. It seems clear that significant measures were taken by the court to afford the general contractor a fair opportunity for its defense. Consequently we will not interfere with his exercise of discretion in allowing the amendment and the joinder. See Ill. Rev. Stat. 1971, ch. 110, par. 26; *Pearce v. Desper* (1957), 11 Ill.2d 569, 578.

Defendants next argue that the trial court erred in not dismissing plaintiff's mechanic's lien claim for failure to serve the sub-contractor's 90-day notice by certified mail "delivery limited to addressee only," as required by section 24 of the Mechanic's Lien Act. Ill. Rev. Stat. 1971, ch. 82, par. 24.

There was testimony that two separate notices were directed to be sent by certified mail to Trust Nos. 3413 and 3399 at the National Boulevard Bank of Chicago. An employee of the bank acknowledged receipt of one notice and indicated that the beneficiaries of Trust No. 3413 and Trust No. 3399 were identical in December of 1970 when these notices were sent. Return receipts indicate that the National Boulevard Bank received copies of each. An agent of the bank testified that Trust No. 3413 had a copy in its files but that there was no record that Trust No. 3399 ever received the notice. The notice was not addressed "delivery limited to addressee only" as set forth in the statute, however, and defendants argue that this non-compliance with the language of the statute prevents the attachment of a mechanic's lien since notice is the basis. (Citing *Shaffer v. Cullerton Corp.* (1957), 13 Ill.App.2d 72, 75; *Hill Behan Lumber Co. v. Marchese* (1971), 1 Ill.App.3d 789, 791.) The cited cases are distinguishable on their facts. In *Shaffer v. Cullerton* no contract had been established; and in *Hill Behan Lumber v. Marchese* there was an entire failure to serve notice.

■■ Upon the record before us it seems apparent that the omission of the limited delivery language did not result in a lack of notification

and should not be the basis for invalidating plaintiff's claim. This rule of strict construction is meant to apply only to requirements upon which the right to a lien depends. (*Charles A. Hohmeier Lumber Co. v. Knight* (1932), 350 Ill. 248, 252-253; *Fitzgerald v. Van Buskirk* (1968), 96 Ill. App 2d 432, 437; *Malkov Lumber Co. v. Serafine Builders, Inc.* (1971), 1 Ill.App.3d 543, 548.) Notice is clearly required as a basis for a mechanic's lien under the authorities, but under the circumstances here the omission to limit delivery to the addressee only is not a deprivation of notice and does not invalidate the claim of lien.

■■ Defendants also allege the lien claim was improperly brought against a non-party bank as escrowee. However, as the plaintiff points out, defendants' contention is without merit since the lien was only against the funds due Auburn and frozen at the Chicago Title & Trust Company at the beginning of the action. The parties with rights to the alleged funds owing Watson were before the court and it was not necessary for the disinterested escrowee to be a party to the action in order for the decree to be valid as to funds which the Chicago Title & Trust Company held pending resolution of the dispute. Even if the judgment as to the Chicago Title & Trust was invalid only that portion of an otherwise valid decree would be void. This would not affect the validity of the remainder of the decree. See, *e.g.*, *People ex rel. Barrett v. Sbarbaro* (1944), 386 Ill. 581, 590-591.

Defendants finally argue that the trial court should have detailed its verdict on their motion so that they might test the reasonableness of the lump sum findings against the evidence.

■■ Findings of fact are not necessary to support a decree in a bench trial at law. (Ill. Rev. Stat. 1971, ch. 110, par. 64(4).) As we have previously noted, defendants had the burden of establishing errors of law or to show that the verdicts were against the manifest weight of the evidence. (See *Smith v. Realcoa Construction Co.* (1973), 13 Ill.App.3d 254, 260.) This they have not done.

For the reasons stated we therefore affirm the judgment of the trial court.

Affirmed.

T. MORAN, P. J., and RECHENMACHER, J., concur.