B & C ELECTRIC, INC., Plaintiff-Appellee, v. PULLMAN BANK AND TRUST COMPANY et al., Defendants-Appellants.—(TALSMA BUILDERS, INC., Plaintiff-Appellant, v. B & C ELECTRIC, INC., Defendant and Counterplaintiff and Third-Party Defendant-Appellee.—(FIDELITY AND DEPOSIT COMPANY OF MARYLAND, Plaintiff and Counterdefendant and Third-Party Plaintiff-Appellee).)

First District (3rd Division)    No. 78-1771

Opinion filed April 15, 1981.—Rehearing denied June 3, 1981.

Donald V. O'Brien, John C. O'Rourke, Jr., and Paddy H. McNamara, all of O'Brien, Carey, McNamara, Scheuneman & Campbell, Ltd., of Chicago, for appellants.

Dent, McNeela & Griffin, Rudnick & Wolfe, Roger C. Goble, and Stanley N. Gore, all of Chicago, for appellees.

Miss JUSTICE McGILLICUDDY delivered the opinion of the court:
This case involves a dispute between a general contractor, Talsma Builders, Inc. (TBI), and its electrical subcontractor, B & C Electric, Inc. (B & C), concerning the scope of work to be performed by B & C on the Pullman Bank & Trust Company building (Pullman). Both parties accuse the other of breach of contract. The action proceeded to trial on B & C's complaint against Pullman, TBI and United States Fidelity and Guaranty Company (TBI's surety) consolidated with TBI's complaint against B & C and Fidelity and Deposit Company of Maryland (B & C's surety). Following a lengthy bench trial the court awarded B & C a judgment against the defendants in the amount of $97,244 and a mechanics' lien on the Pullman Bank building. The court dismissed with prejudice TBI's complaint and entered judgment in favor of B & C and its surety. It is from these judgments that the defendants appeal.

The evidence presented at trial reveals the following sequence of events. In February of 1973, James Magro, an estimator for B & C, reviewed the plans and specifications for the Pullman job. Magro discovered what he believed to be a discrepancy in the specifications concerning the provision of the temporary electrical service for the project.

Paragraph 16A3(a) of the specifications provides that the electrical contractor shall "perform all Electrical work as shown on the drawings and as described in separate actions hereinafter under one Electrical Contract." Subparagraph (g) further provides that the electrical contractor shall "include all temporary power and lighting in this contract in accordance with the General Contractor's requirements." Paragraph 16B9 states that the electrical contractor shall "provide all temporary facilities required to supply temporary power and light. * * * The General Contractor shall arrange and pay for all temporary light and power, as well as the operating expense."

Magro brought these provisions to the attention of William Jackson, an officer and director of B & C. In the presence of Magro, Jackson telephoned the office of the architect who had prepared the plans to ascertain who was responsible for the cost of installing the temporary service. Someone from the architect's office responded that the electrical contractor was to install all the temporary wiring, and the general contractor was to pay for it. Thereafter, B & C telephoned TBI with its bid for the Pullman job, which did not include the cost of labor and material to install the temporary services.

Subsequently, TBI was awarded the Pullman construction contract. On March 20, 1973, TBI received B & C's written proposal to perform the electrical work on the project "in accordance with plans and specifications" for the sum of $342,500. During a phone conversation a few days later between Jackson and Arthur Talsma, TBI's president, this figure was revised to $350,000.

On April 11, 1973, TBI prepared a written subcontract agreement and forwarded it to B & C. The contract provided that B & C would furnish all necessary temporary service.

Jackson testified that when he received the proposed contract, he went to TBI's offices and informed Talsma that B & C's bid did not include the cost of the temporary services. After some discussion, Jackson suggested that B & C absorb the cost for the temporary wiring for the inside of the building, and that TBI pay for the temporary wiring of the outside of the building and the excess facilities charge. According to Jackson, Talsma agreed with this modification and advised Jackson to send him a cover letter regarding the contract.

On May 30, 1973, Jackson sent a letter to Talsma returning the contract upon which he had crossed out the provision concerning the temporary service. The letter referred to the situation "which I explained to you in your office on April 13, 1973, and at which time you requested B & C Electric, Inc. to write a cover letter regarding same."

Talsma testified that he did not meet with Jackson on April 13. He also denied the existence of any agreement concerning the cost of the

temporary service and asserted that he had not heard of the alleged agreement until he read a copy of the complaint in the present action.

During the month of June 1973, B & C electricians worked at the construction site. On June 26 TBI's executive vice-president, Byron Whitford, returned the contract to Jackson along with a letter indicating that TBI would not accept the deletion of the provision concerning the temporary service.

Jackson claimed that he did not receive this letter until July 31. Jackson immediately responded with a letter dated July 31, 1973, to TBI in which he maintained that Talsma had agreed to the deletion. He further stated that B & C would proceed with its work without a contract in order to avoid any delay in the construction.

B & C continued its performance pursuant to the contract. It billed and received progress payments for labor and materials including the installation of the temporary service. Although B & C designated the $7980 due for the temporary service as an extra to the contract, TBI credited its payment for the temporary service against the $350,000 contract price.

On November 13, 1973, B & C sent TBI a breakdown of the bill for the temporary service. On November 16, 1973, Talsma wrote Jackson reiterating TBI's position that B & C was responsible for the temporary service.

Work proceeded on the construction without incident through February 1974. According to Talsma, on February 14 Magro of B & C indicated to the architect at a job-site meeting that unless TBI paid for the temporary service, B & C would not order the electrical fixtures for the job. On March 1 TBI wrote B & C disclaiming again its responsibility for the temporary service. TBI warned B & C that unless it was advised within seven days that the fixtures had been ordered, it would hold B & C in default of its contract.

David Obert, TBI's project superintendent, testified that on March 19 at a job-site meeting, Jackson informed him that B & C would not order the fixtures until the dispute was resolved. Jackson, however, denied that he made such a statement. Obert also testified that the architect informed Jackson at this meeting that the temporary power was B & C's responsibility.

Meanwhile, attorneys for both parties became involved in the dispute. Donald Bradley, TBI's attorney, testified that on March 15 Warren Ross, B & C's attorney, acknowledged that B & C would not order the fixtures or procure a Chicago building permit until TBI paid for the temporary service. However, on March 26 Ross advised Bradley that the fixtures had been ordered and an application had been made for a Chicago building permit.

Jackson testified that on April 10 TBI's treasurer, Richard Reszel, advised him on the telephone that unless B & C absorbed the cost of the temporary service, TBI would not issue to B & C its monthly progress payment for March or any future payment.

On April 17 Ross, B & C's attorney, wrote Bradley that "I have been instructed by Mr. Jackson to advise you that the fixtures will not be installed, nor the work completed until we have a written contract executed by all the necessary parties." Jackson testified that despite the statement in this letter, B & C continued performing on the job.

Bradley responded to Ross' letter on April 25. He informed Ross that his interpretation of the April 18 letter was that B & C was repudiating the contract. Bradley asked for a confirmation from B & C within 10 days whether it would complete the project for the total price of $350,000.

On May 2 TBI sent its check in the amount of $19,800, payable to B & C for its monthly progress payment, to Bradley. The check was sent to TBI's attorney because "of the repudiation of our contract as set forth in a letter to you dated April 17, 1974 by Warren Ross." When Jackson received a copy of this letter on May 3 he called Reszel who told him that B & C would not receive its check until it agreed to absorb the cost of the temporary service. In a telephone conversation with Ross, Bradley confirmed that he would not release the check until B & C abandoned its claim. That afternoon Jackson went to the job site, ordered his foreman to shut off the power and directed his employees to leave the job site.

On May 8 Ross wrote Bradley that B & C would return to work upon receipt of its March and April payments. B & C agreed to reserve its claim for the temporary service until the completion of the job on schedule. However, on May 9, prior to receipt of this letter, TBI executed a contract with a new electrical subcontractor to complete the work. Although TBI had paid B & C $216,900 under the $350,000 contract, it paid the new contractor over $395,000 to complete the electrical work.

Francis Korbus, B & C's foreman, testified that B & C was progressing according to schedule on May 3 when it left the job. He explained that the reason the fixtures had not been installed at that time was the absence of ceilings in the building.

Obert, TBI's project superintendent, testified that when B & C left the job its work conformed to the specifications. He also stated that no delay in construction resulted from any failure of B & C to install electrical fixtures.

At the conclusion of all the evidence the trial court found that there was no written contract between TBI and B & C, that TBI wrongfully withheld B & C's March progress payment, that B & C had a right to stop work and that TBI entered into a contract with another electrical contrac-

tor after B & C had advised TBI that it would return to work. In addition, the court found that there was no complaint concerning the quality and timeliness of B & C's work during construction. Accordingly, the trial court entered judgment in favor of B & C in both actions. The court's award of damages of $97,244 included monies owed B & C for (1) the March and April progress payments, (2) the 10% retention of progress payments previously made, (3) work performed pursuant to approved change orders, (4) floor box trim that was delivered subsequent to B & C's departure from the job and (5) the temporary service.

On appeal TBI argues that the trial court's judgment in favor of B & C was predicated on several erroneous findings. TBI contends that the trial court erred (1) in failing to find the existence of a contractual relationship between TBI and B & C, (2) in finding that TBI breached the contract, (3) in failing to determine which party had the responsibility to furnish the temporary service, (4) in failing to find that B & C waived its right to stop performance and (5) in finding that TBI entered into a contract with another electrical contractor after B & C had agreed to return to work. In addition, TBI maintains that the trial court erred in awarding B & C a mechanics' lien on the Pullman property and in its calculation of damages.

I

TBI contends that the trial court's judgment in favor of B & C was the result of several erroneous findings of fact and of the court's failure to make several significant findings of fact. TBI first alleges that the trial court failed to answer the significant question of whether any contract existed between the parties. Although the court's only finding concerning the contract was that there was no written contract, its acknowledgment of the existence of a contract is apparent from the judgment order which awarded B & C a mechanics' lien on the Pullman property. The Mechanics' Lien Act requires the existence of a contract before a subcontractor or contractor acquires a lien on the subject property. Ill. Rev. Stat. 1973, ch. 82, par. 1.

■■ When a subcontractor submits a bid in accordance with prepared plans and specifications, the contractor's acceptance of the bid may constitute the contract even though the agreement is never reduced to a formal written instrument. (*West Chicago Park Commissioners v. Carmody* (1908), 139 Ill. App. 635; 1 Corbin on Contracts §30, at 100-03 (1963).) In March of 1973 when TBI through its president accepted B & C's written proposal to perform the electrical work on the project according to the plans and specifications at a total cost of $350,000, a contract existed between the parties. The fact that the parties subse-

quently differed on the interpretation of a provision in the specifications does not invalidate the contract. 1 Corbin on Contracts §85, at 367 (1963).

■■ TBI next contends that the court erred in finding that TBI, rather than B & C, breached the contract. It argues that the April 17 letter of Warren Ross, B & C's attorney, was an anticipatory breach of contract which excused TBI from completing its contractual obligations, including the issuance of the March progress payment.

When a party to an executory contract gives notice of his intention not to comply with his obligations, the other party may treat such notice as an anticipatory breach and consider the contract terminated without waiting for the completion of the contract pursuant to its terms. (*Student Transit Corp. v. Board of Education* (1979), 76 Ill. App. 3d 366, 395 N.E.2d 69.) In such a case the nonbreaching party is not required to tender performance or to comply with any conditions precedent. *Builder's Concrete Co. v. Fred Faubel & Sons, Inc.* (1978), 58 Ill. App. 3d 100, 373 N.E.2d 863.

However, before the renunciation can be treated as an anticipatory breach, there must be a positive and unequivocal manifestation of intention that the party will not render the promised performance when the time fixed in the contract arrives. A definite statement to the second party that the first party either will not or cannot perform the contract will operate as an anticipatory breach. *Farwell Construction Co. v. Ticktin* (1978), 59 Ill. App. 3d 954, 376 N.E.2d 621; *Stonecipher v. Pillatsch* (1975), 30 Ill. App. 3d 140, 332 N.E.2d 151; 4 Corbin on Contracts §973, at 905 (1951).

In the instant case there is evidence to support the trial court's conclusion that Ross' letter did not constitute an anticipatory breach. The letter recited "I have been instructed by Mr. Jackson to advise you that the fixtures will not be installed, nor the work completed until we have a written contract executed by all necessary parties." However, the evidence revealed that B & C continued to work on the building in a satisfactory manner with no delay in the progress of the construction.

Despite the language in Ross' letter, B & C's conduct indicated a willingness to continue work. The evidence supports the court's conclusion that there was no positive and unequivocal manifestation by B & C that it intended to abandon the job.

■■ TBI claims that it was relieved of its obligation to issue the March progress payment when B & C breached the contract. However, the trial court found no breach on the part of B & C. Instead it found that TBI breached the contract when it refused to transmit the progress payment. Such a refusal is a substantial breach of a contract and gives the contractor the right to consider the contract at an end, to cease work and to recover

the value of the work already performed. *Brady Brick & Supply Co. v. Lotito* (1976), 43 Ill. App. 3d 69, 356 N.E.2d 1126.

The resolution of the issue as to which party breached the contract is a question for the trier of fact, and its finding will not be disturbed unless it is contrary to the manifest weight of the evidence. (*Yale Development Co. v. Texaco, Inc.* (1977), 51 Ill. App. 3d 616, 366 N.E.2d 892; *Watson v. Auburn Iron Works, Inc.* (1974), 23 Ill. App. 3d 265, 318 N.E.2d 508.) In the instant case the trial court heard extensive and conflicting evidence concerning which party breached the contract and decided in favor of B & C. We cannot say that this finding was against the manifest weight of the evidence.

TBI also contends that the trial court's erroneous decision resulted from its failure to determine which party had the responsibility to furnish the temporary service. Although the trial court made no specific finding, it apparently accepted B & C's argument that TBI was responsible since the court's damage award to B & C included $7980 for the temporary service.

TBI argues that the specifications unambiguously state that the electrical contractor shall provide all of the electrical work, including the temporary service. A contract is ambiguous when it is reasonably susceptible to different constructions. (*Rao v. Parvathaneni* (1979), 72 Ill. App. 3d 1, 390 N.E.2d 496.) Whether a contract is ambiguous or not is a question of law. *State Security Insurance Co. v. Linton* (1978), 67 Ill. App. 3d 480, 384 N.E.2d 718; *Public Relations Board, Inc. v. United Van Lines, Inc.* (1978), 57 Ill. App. 3d 832, 373 N.E.2d 727.

■■ We agree with TBI that there is no ambiguity in the contract. B & C agreed to perform all electrical work in accordance with the plans and specifications which clearly provide that the electrical contractor shall furnish the temporary power and lighting. Paragraph 16B9, which stated that the general contractor shall arrange and pay for the temporary service, made this work the responsibility of the general contractor vis-à-vis the owner. It in no way altered the requirement that the electrical contractor furnish the service since the contract specifically stated that all electrical work was to be performed under one contract. The only reasonable interpretation of B & C's agreement to perform all electrical work is that this agreement included the installation of the temporary service. Therefore, B & C had no right to demand that the cost for this work be treated as an extra to the contract.

B & C's unjustified demand, however, was not a breach of the contract. Although B & C continuously insisted that it was entitled to the extra payment and threatened to stop work unless its demand was satisfied, B & C performed in accordance with the contract in a

satisfactory and timely manner for over a year following the discovery of the disputed matter. As we have previously discussed, there is evidence to support the trial court's finding that the breach occurred when TBI wrongfully withheld B & C's progress payment. The failure of the trial court to find that B & C's claim was unjustified in no way prejudiced TBI.

■■ TBI also points out that in July of 1973 B & C was aware that TBI had no intention of treating the temporary service as an extra to the contract. However, in his letter of July 31, 1973, Jackson elected to continue with performance despite his belief that TBI had breached the agreement. TBI argues that when an injured party chooses to continue performance after a breach of contract, he waives his right to stop performance at a future date. (*South Beloit Electric Co. v. Lar Gar Enterprises, Inc.* (1967), 80 Ill. App. 2d 367, 224 N.E.2d 306.) However, this principle is inapplicable in the instant case because B & C did not cease performance because of the alleged earlier breach (nonpayment for temporary service), but because TBI wrongfully withheld the progress payment.

■■ Finally, TBI asserts that the trial court's finding that it entered into a contract for the completion of the electrical work subsequent to B & C's announcement that it would return to work, was erroneous. It contends that the record establishes that the anticipatory breach of B & C was never retracted and that TBI was entitled to contract with another party to complete the project. However, it was the trial court's finding that B & C did not breach the contract; therefore, there was no breach to retract. The court's finding concerning B & C's willingness to return to work was unnecessary for its determination of who was the breaching party.

## II

TBI also contends that B & C was not entitled to a mechanics' lien because B & C breached the contract. However, as we have thoroughly discussed in part I of this opinion, the trial court found no breach by B & C.

■■ TBI also argues that, pursuant to section 4 of the Mechanics' Lien Act (Ill. Rev. Stat. 1973, ch. 82, par. 4), B & C had no right to abandon the job on May 3, 1974. Section 4 provides in pertinent part that:

> "When the owner of the land shall fail to pay the contractor moneys justly due him under the contract at the time when the same should be paid, * * * the contractor may discontinue work, * * * and if after such breach for the period of ten days the owner shall fail to comply with his contract, the contractor may abandon the work, and in such a case the contractor shall be entitled to enforce his lien for the value of what has been done, and the court

shall adjust his claim and allow him a lien accordingly." (Ill. Rev. Stat. 1973, ch. 82, par. 4.)

TBI argues that B & C could not abandon the job until 10 days after the March 1974 progress payment was withheld.

On May 3, when B & C realized that TBI was withholding its progress payment, B & C discontinued performance as the statute provided. At that point B & C had not abandoned the job as evidenced by its offer to return to work and reserve its claim. TBI, however, hired a new electrical contractor. Thus, B & C was justified in abandoning the job and pursuing its legal remedies.

## III

Finally, TBI contends that assuming B & C's abandonment of the work was justified, B & C was entitled to recover the contract price less the cost of completing the work. Using this formula, B & C would not be entitled to any damages since the cost of completion exceeded the amount of money owed to B & C under the contract.

Section 346(2) of the Restatement of Contracts (1932) provides that where there is a total breach of contract by one who has promised to pay for construction, the builder is entitled to a judgment for either,

"(a) the entire contract price and compensation for unavoidable special harm that the defendant had reason to foresee when the contract was made, less installments already paid and the cost of completion that the builder can reasonably save by not completing the work; or

(b) the amount of his expenditure in part performance of the contract, subject to the limitations stated in §333."

Section 333(d) provides that:

"If full performance would have resulted in a net loss to the plaintiff, the amount of this loss must be deducted, the burden of proof being on the defendant."

In the instant case the trial court awarded B & C a judgment in the amount of its expenditures in part performance of the contract. Although TBI presented evidence to the trial court to show that full performance would have resulted in a net loss to B & C, B & C presented evidence to show that it would have realized a profit upon the completion of the contract. After considering the conflicting evidence, the trial court apparently found that TBI failed to meet its burden of proving that B & C would have suffered a loss upon completion of the contract. Our review of the record convinces us that such a finding is not against the manifest weight of the evidence. See *Watson v. Auburn Iron Works, Inc.* (1974), 23 Ill. App. 3d 265, 318 N.E.2d 508.

The trial court's award of damages included $7980 for the temporary service. As we discussed earlier in this opinion, the temporary service was not an extra to the contract and should not have been included in the award of damages.

Accordingly, for the reasons stated, the judgment in favor of B & C is reversed in part and the cause is remanded to the trial court with directions to reduce the judgment by $7980. In all other respects, the judgment of the Circuit Court of Cook County is hereby affirmed.

Affirmed in part, reversed in part and remanded with directions.

RIZZI, P. J., and McNAMARA, J., concur.