**ATARI, INC., a Delaware corporation, Plaintiff,**

v.

**HARRIS TRUST AND SAVINGS BANK, an Illinois corporation, Defendant.**

**No. 84 C 2924.**

United States District Court, N.D. Illinois, E.D.

Nov. 14, 1984.

William A. Streff, Jr., William H. Pratt, Mark E. Ferguson, Kirkland & Ellis, Chicago, Ill., for plaintiff.

James M. Breen, Chapman & Cutler, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

WILLIAM T. HART, District Judge.

On April 14, 1984, plaintiff Atari, Inc. ("Atari") filed this diversity action against defendant Harris Trust & Savings Bank ("Harris"), advancing claims of negligence and of wrongful dishonor of a letter of credit issued by Harris. Harris subsequently moved to dismiss all claims and Atari responded with a cross-motion for summary judgment. On September 7, 1984, the Court granted Harris' motion in part, dismissing Atari's two negligence counts. However, since both parties had submitted evidentiary material, the Court informed the parties, pursuant to Fed.R. Civ.P. 12(b)(6), that it would treat the motions directed to the wrongful dishonor claims as cross-motions for summary judgment. On October 31, 1984, the Court requested supplemental briefs addressing issues raised by Atari's claim that Harris repudiated the credit. These cross-motions are the matters currently before the Court.

### FACTS

Atari is a Delaware corporation with its principal place of business in Sunnyvale, California, engaged in the business of designing, manufacturing and selling products such as home computers and video games. Atari distributes these consumer products through local distributors, such as Atari's former Chicago-area distributor, S–W Distributors, Inc. ("S–W"). Since the bulk of Atari's sales to S–W were on open account, Atari required S–W to obtain a letter of credit to secure portions of S–W's credit.

At S–W's request, Harris issued an irrevocable standby letter of credit in favor of Atari. The credit issued by Harris was expressly made subject to the Uniform Customs and Practices for Documentary Credits (the "UCPDC"). The credit was initially issued in the amount of $400,000 and was effective for the period March 9, 1982 through June 8, 1982. Also at S–W's request, Harris amended the credit on several occasions to either increase the amount of the credit or extend its expiry date. On June 16, 1983, Harris amended the credit to provide an amount of $1,500,-000 and an expiry date of January 31, 1984.

The documentary requirements of the credit remained unchanged despite these amendments. As stated in the original March 9, 1982 credit, they were as follows:

(A) Beneficiary's signed certificate stating that, 'The amount drawn is due and unpaid by S–W Distributors, Inc., under the attached invoice copy(ies) in accordance with the terms therein specified and is in excess of our established open account terms of $500,000 and is net of any returns and allowances.'

(B) The invoice copy(ies) referenced in paragraph A above.

(C) Copy of truck bills of lading or air waybills indicating acceptance by the carrier of the merchandise described in the accompanying invoices for delivery to S–W Distributors, Inc.

On November 2, 1982, four days after S–W terminated its distributorship with Atari, Harris issued a further amendment to the credit, raising the "floor" amount of the credit (representing the unsecured portion of S–W's open account) from $500,000 to $1,000,000. Although Harris has indicated that the November 2nd amendment was mailed in the normal course of business, Atari maintains that it has no record of ever receiving the November 2nd amendment.

On December 27, 1983, Harris notified Atari by letter that effective December 10, 1983 the credit "is at zero balance and should be considered null and void." Atari responded on December 27, 1983, stating that since the credit as issued was irrevocable, Atari would expect Harris to honor any proper demand for payment under the credit.

On January 31, 1984, Atari attempted to draw $395,391.68 on the credit, presenting its sight draft in that amount together with the following documentation:

(a) a signed certificate stating that 'The amount drawn is due and unpaid by [S–W] under the attached invoice copies in accordance with the terms therein specified and is in excess of our established open account terms of $500,000.00 and is net of any returns and allowances.'

(b) eighteen Atari invoices to S–W in the total amount of $2,120,679.

(c) A series of truck bills of lading, together with Atari's packing lists for each of the shipments.

On February 3, 1984, Harris notified Atari by letter that it refused to honor Atari's draft as noncomplying, citing a series of twenty-one asserted nonconformities in the documents presented. Harris' primary objection was that "the description of the merchandise and the quantity thereof specified in the bill[s] of lading attached to [certain invoices was] inconsistent with the description and amount of merchandise specified in [the invoices]." Consequently, Harris asserted that the bills of lading did not comply with paragraph (c) of the credit in that they did not "indicate acceptance by the carrier of the merchandise, and the quantity thereof, described in [the invoices]." Harris lodged this objection to fourteen of the eighteen invoices submitted, totalling $1,981,773.

Harris also objected to the lack of any signature by the carrier on bills of lading supporting three invoices. Harris further objected to Atari's certificate, asserting that: (i) it did not conform to the November 2, 1983 amendment which raised the "floor" from $500,000 to $1,000,000 and (ii) was inconsistent with certain invoices stamped as "Void." Harris also objected that the amount of the invoices presented exceeded the amount of the draft. Finally, Harris noted that it had received information from S–W to the effect that (i) one invoice presented by Atari in the amount of $3,420 had in fact been paid by S–W and (ii) six of the invoices presented by Atari had been cancelled through credit memos and lesser amounts were later rebilled on invoices not presented. Harris made no objection to two invoices totalling $119,448 (Nos. 705524 and 705902).

## DISCUSSION

### Wrongful Dishonor on January 31, 1984

Harris contends that it is entitled to judgment in its favor because it properly

dishonored Atari's attempted draw, based on any one of the several objections Harris initially advanced. Atari maintains that since it presented invoices supporting an amount vastly in excess of the amount of its draw, Harris was required to honor the draw if any complying group of invoices equalling the amount of its draft could be found among those presented. Because some of Harris' objections were unfounded, Atari argues, it is entitled to summary judgment in its favor regardless of other valid objections. The parties agree that the issues in this diversity action must be decided under Illinois law. *See Crocker Commercial Services v. Countryside Bank*, 538 F.Supp. 1360, 1362 (N.D.Ill. 1981).

In light of Harris' valid objections to two of the invoices presented by Atari (No. 70865—invoiced merchandise description not consistent with bill of lading description, No. 708065—no carrier signature on bill of lading indicating acceptance of goods), the issue of whether a single defect justifies dishonor becomes dispositive. However, before reaching this central issue, a number of preliminary matters must be addressed.

Harris contends that in order for the Court to grant judgment in favor of Atari, it must find that the November 2, 1983 amendment ineffective. Had the amendment been operative, Atari's certificate would have been nonconforming, as it referred to the $500,000 "floor" previously in effect rather than the $1,000,000 "floor" contained in the November 2nd amendment.

■ The Court is compelled to make that finding. Illinois' version of the Uniform Commercial Code ("UCC"), (Ill.Rev.Stat. 1981, ch. 26, § 5–106(2)) provides that once an irrevocable letter of credit, of the kind issued by Harris in favor of Atari, "is established as regards the beneficiary it can be modified or revoked only with his consent." Aside from evidence relating to the underlying agreement *between S–W and Atari*, Harris has produced no evidence that Atari consented to the November 2nd amendment. Evidence as to the relation between Atari and S–W contained in Atari's internal memoranda and conversations between S–W and Harris personnel has no bearing on Harris' relation to Atari. *Mount Prospect State Bank v. Marine Midland Bank*, 121 Ill.App.3d 295, 76 Ill. Dec. 844, 987, 459 N.E.2d 979, 983 (1st Dist.1983). Rather, this evidence indicates only that Atari and S–W may have been renegotiating the credit terms of the distributorship agreement. There is no evidence that Atari expressed *to Harris* its consent to a modification of the letter of credit terms.

■ Harris next maintains that by including in the documents presented to Harris invoices stamped "VOID," Atari created an inconsistency among the documents justifying the dishonor. Harris argues that since voided invoices could not be "Due and unpaid," the voided invoices were not consistent with Atari's certification that the amount of its draw was "Due and unpaid ... *under the attached invoices (copies).*" In each instance where Atari included a voided invoice, Atari also presented the correcting debit and credit memos together with the final corrected invoice to S–W. It is the final corrected invoice which Atari submitted to support its draw. The voided invoice, credit and debit memos were presented solely for purposes of explication. That such was their purpose is clear from the documents themselves. These documents do not create an inconsistency between the invoices and Atari's certification that the amount of the draw was due and unpaid under the invoices presented.

Next Harris contends that it properly dishonored the draw due to Atari's presentation of excess invoices and bills of lading, which rendered the invoices inconsistent with the amount of the draw. In support of its position, Harris cites *Oriental Pacific, Inc. v. Toronto Dominion Bank*, 78 Misc.2d 819, 357 N.Y.S.2d 957 (N.Y.Sup. 1974).

In *Oriental Pacific*, the New York Court found that the issuing bank properly dishonored a draft for $37,919.41 presented with a single invoice of $39,206.26. However, the court rested its finding in *Oriental Pacific* on the fact that the invoice exceeded the total amount available under the credit. As noted in *Oriental Pacific*, Article 32(b) of the UCPDC *permits* (but does not require) an issuing bank to dishonor a draft supported by "commercial invoices issued for amounts in excess of the amount permitted by the credit." Here, Harris did not initially justify its dishonor by reference to the amount of the *credit,* noting instead the variance between the amount of the *draft* and the *invoices* presented. Hence, the former ground for dishonor is waived. *See Northern Trust Co. v. Oxford Speaker Co.,* 109 Ill.App.3d 433, 65 Ill.Dec. 113, 440 N.E.2d 968 (1st Dist.1982). *See also American Employers Insurance Co. v. Pioneer Bank & Trust Co.,* 538 F.Supp. 1354, 1357 (N.D.Ill.1981). And unlike the case where the beneficiary presents invoices exceeding the amount of the credit available, the UCPDC contains no bar to submitting an amount of invoices in excess of the amount of the draft presented for payment. To the contrary, Illinois law permits partial draw on the credit amount. (Ill.Rev.Stat.1981, ch. 26, § 5–110(1)). Such a partial draw could under many circumstances be supported by an invoice exceeding the amount of the draw.

Moreover, Article 32(b) of the UCPDC is directed to the needs of a sales credit, where the credit is designed to secure payment in a *single* transaction. Where a single sales transaction is involved and the sales credit secures the full amount of the transaction, the issuing bank could justifiably infer from the receipt of an invoice whose amount exceeds that of the credit that something was amiss. However, where a standby credit, such as the one issued here by Harris, secures a *series* of transactions, no correlation is required between the amount of any single invoice and the total credit amount. Consequently, Atari's overinclusive submission did not itself justify the dishonor.

Nonetheless, a beneficiary of a standby letter of credit cannot with impunity simply empty its receivables file on the issuing bank's counters. As Harris points out, the issuing bank's decision to dishonor a draw cannot be viewed in a vacuum. Where the excess documents create some inconsistency or nonconformity which affects other documents, the bank may dishonor the draw even if, absent the excess documents, no nonconformity would have existed.

Harris argues that when faced with a $395,391.68 draw on a standby credit with a $500,000 "floor," together with $2,120,677 worth of invoices, it would assume only one of two sets of facts. Either: "(i) the amount actually owing from S–W under the attached invoices was $395,391.68, the amount of the draw; or (ii) the amount owing from S–W under the attached invoices was $895,391.68, the amount of the draw plus the $500,000 open credit referenced in the [credit]." Consequently, reasons Harris, some of the invoices must have been paid or subject to returns and allowances, so that *all* the submitted documents had to conform to the credit terms to support the amount of the draw. The beneficiary's ability to present partial draws under a letter of credit undercuts Harris' argument. In light of the possibility that Atari's draw may have been only a partial draw, a third assumption was equally plausible; that $2,120,677 was actually owing from S–W but that Atari had chosen to draw less than the full amount it could demand under the credit. That Atari presented its apparently partial draw on the last day on which the credit remained in effect and therefore could not draw down the credit any further does not render that assumption implausible. The issuer can no more speculate as to what motivates a beneficiary to draw less than the full amount of the credit than can a beneficiary speculate as to the issuer's motivation for dishonoring its draw. In either

case, whether the party's act was proper depends solely on the documents.

▮ Therefore, the Court turns to the documents presented by Atari. The chief objection lodged by Harris is that Atari's invoices are inconsistent with the bills of lading presented as to the descriptions of the merchandise and their quantities; contrary to paragraph (c) of the credit. Paragraph (c) of the credit requires presentation of "bills of lading indicating acceptance by the carrier of the merchandise described in the accompanying invoices for delivery to S–W Distributors, Inc." Any ambiguity in this language must be construed against Harris. Since the issuer (or its customer) has the opportunity to draft any desired protections into the credit, the Court will not infer added protections, not clearly conveyed to the beneficiary. *American Employers Insurance Co.*, 538 F.Supp. at 1358. "The corollary to the rule of strict compliance is [the rule] that the requirements in letters of credit be explicit and that all ambiguities are to be construed against the [issuing] bank. Since the beneficiary must comply strictly with the requirements of the letter, it must know precisely and unequivocally what those requirements are." *Marino Industries Corp. v. Chase Manhattan Bank, N.A.*, 686 F.2d 112, 115 (2d Cir.1982).

▮ Measured by these standards, Harris' reading of paragraph (c) to require bills of lading that described the merchandise in terms *identical* to those used in the invoices and listed quantities in the same units of measure as did the invoices, is unreasonable. Had Harris (and S–W) desired that Atari present identical invoices and bills of lading, it was obligated to set forth this exacting requirement "precisely and unequivocally" in the credit, so that Atari could take at the time of shipment any steps necessary to insure its ability to meet such a requirement.

Atari's interpretation of paragraph (c) of the credit is more reasonable; that the bills of lading presented evidence shipment to S–W of all invoiced items with quantities and descriptions not inconsistent with those invoiced. *See* H. Harfield, *Letters of Credit*, pp. 45, 51–55. Article 32(c) of UCPDC requires invoices to describe goods with greater particularity than that required of bills of lading.

'The description of goods in the commercial invoice must correspond with the description in the credit. In all other documents, the goods may be described in general terms not inconsistent with the description in the credit.'

▮ Turning to the invoices, bills of lading and packing slips presented, these documents, taken together, satisfy the requirements of paragraph (c). Atari's invoices describe the merchandise by reference to specific video games and accessories (e.g., Pac-Man, Space Invaders, Defender, Centipede, etc.; trackball control, A/C adaptor, joystick control) and list quantities in terms of units. The bills of lading refer to the merchandise as either "Games or Toys," "Semi conductor Devices" or "Controller Parts" and list quantities in terms of the number of cartons and skids or pallets accepted by the carrier. Atari's packing lists describe the merchandise in the same terms and quantities as do the invoices. In addition, certain of the bills of lading contain a handwritten reconciliation of the number of boxes or cartons to the number of units shipped (*see, e.g.*, bills of lading supporting invoice 896240, packing lists for invoices 896241, 896747, 893811, 893901, 892286).

On the face of the invoices and bills of lading, the documents are consistent. The "shipping date" listed on each invoice corresponds to the date on which the carrier indicates acceptance of the merchandise (or in the case of partial shipments, of the last shipment). The descriptions on the bills of lading are more generalized, but not inconsistent with the invoice descriptions. Nor are the quantities, measured in different units of measure, inconsistent. The bill of lading quantities admittedly do not correlate in any meaningful way with the invoiced quantities (save for invoice 896240). However, this is where the packing list reconciliations play a role. These reconcili-

ations tie the invoices and bills of lading together, so that the three documents together satisfy even the higher standard of equivalent quantities claimed by Harris. Therefore, Harris' objections based on inconsistent descriptions and quantities are unfounded.

Since Harris' only objections to six invoices totalling $1,290,097 were the quantity/description and voided/reinvoiced objections rejected above, the Court need not address Harris' claim that certain invoices (six invoices totalling $587,105) were either paid or cancelled, and so fraudulently presented as due and unpaid. The Court also need not address the parties' dispute as to whether the credit required Atari to present invoices covering only the amount of its draw or also covering the $500,000 "floor."[1] Because the nonconformities raised by Harris as to the other invoices do not in any way affect the group of invoices as to which either no objection or only unfounded objections were raised and this latter group adequately supports the amount of Atari's draw under either interpretation of the amount of invoices Atari was required to present, Atari's motion for

summary judgment of liability as to Count II is granted.

## ANTICIPATORY REPUDIATION OF DECEMBER 22, 1983

Harris does not dispute that one of its commercial banking officers sent a letter to Atari, dated December 22, 1983, informing Atari that the S–W letter of credit "is at zero balance and should be considered null and void."[2] Nor does Harris dispute that its "promise to pay under the credit is irrevocable." *Philadelphia Gear Corp. v. Central Bank,* 717 F.2d 230, 235 (5th Cir.1983). Harris does contest the application of the UCC (Ill.Rev.Stat.1981, ch. 26, § 5–115(2)), which provides:

(2) When an issuer wrongfully cancels or otherwise repudiates a credit before presentment of a draft or demand for payment drawn under it the beneficiary has the rights of a seller after anticipatory repudiation by the buyer under Section 2–610 if he learns of the repudiation in time reasonably to avoid procurement of the required documents. Otherwise the beneficiary has an immediate right of action for wrongful dishonor.[3]

---

1. However, the Court notes that invoice 896240 alone, in the amount of $436,674, adequately covers the amount of Atari's draw and satisfies even Harris' interpretation of paragraph (c), without reference to its accompanying packing list. Hence, a finding that Harris properly dishonored Atari's draw would require a conclusion that Harris' proposed higher standard was correct *and* that Atari was required to submit complying invoices covering both the amount of its draw and the $500,000 floor.

2. Harris maintains that this letter did not amount to a repudiation of its obligations. Illinois courts regard a clear statement by a promisor to its promisee that it will not perform, as a repudiation. *See, e.g., B & C Electric, Inc. v. Pullman Bank & Trust Co.,* 96 Ill.App.3d 321, 51 Ill.Dec. 698, 673, 421 N.E.2d 206, 211 (1st Dist. 1981) (but a parties' actions may negate its words); *Schilling v. Book,* 84 Ill.App.3d 972, 39 Ill.Dec. 845, 849, 405 N.E.2d 824, 828 (3d Dist. 1980). Harris' letter fits squarely within the category of statements constituting a repudiation.

3. Section 2–610 provides:
    When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the

value of the contract to the other, the aggrieved party may

(a) for a commercially reasonable time await performance by the repudiating party; or

(b) resort to any remedy for breach (Section 2–703 or Section 2–711), even though he has notified the repudiating party that he would await the latter's performance and has urged retraction; and

(c) in either case suspend his own performance or proceed in accordance with the provisions of this Article on the seller's right to identify goods to the contract notwithstanding breach or to salvage unfinished goods.

Section 2–711 provides, in relevant part:

(1) Where the seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance then with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract (Section 2612), the buyer may cancel and whether or not he has done so may in addition to recovering so much of the price as had been paid

(a) "cover" and have damages under the next section as to all the goods affected whether or not they have been identified to the contract; or

Further, Harris argues that: (i) an anticipatory repudiation does not excuse strict compliance, should the beneficiary subsequently choose to draw on the credit and (ii) that a subsequent draw waives the prior repudiation. *See Ufitec, S.A. v. Trade Bank & Trust Co.*, 21 A.D.2d 187, 249 N.Y.S.2d 557 (1964), *aff'd* 16 N.Y.2d 698, 261 N.Y.S.2d 893, 209 N.E.2d 551 (N.Y.Ct.App.1965). Harris also maintains [4] that Atari has not shown (or alleged) that at the time of the repudiation it was ready, willing and able to perform under the credit by presenting a proper demand for payment. *See Nikkei International, Inc. v. Federal Republic of Nigeria*, 497 F.Supp. 893, 907 (S.D.N.Y. 1980), *aff'd*, 647 F.2d 300 (2d Cir.1981), *cert. denied*, 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982) (applying pre-UCC contract law principles to a letter of credit governed solely by the UCPDC).

Harris has failed to cite any Illinois authority for its position that the UCPDC completely supercedes Article Five of the UCC where a credit is made subject to the UCPDC by the parties. Illinois courts have applied the UCC to letters of credit that were subject to the UCPDC. *See, e.g., Mount Prospect Bank*, 76 Ill.Dec. at 846–48, 459 N.E.2d at 981–83. The authority cited by Harris involves the application of New York law, which expressly provides that the UCPDC, where applicable, supercedes the UCC. N.Y.U.C.C. § 5–102(4). *See Nikkei International, Inc.*, 497 F.Supp. at 907. The Illinois version of the UCC does not contain this unique provision. *See Hawkland, Uniform Commercial Code Series*, §§ 5–102:07, 5–102:08 (particularly at n. 1, which indicates that only Alabama, Arizona and Missouri follow New York in this matter). Therefore, the Court concludes that § 5–115(2) applies to the credit here at issue.

Without accepting Harris' position that to recover on the repudiation, Atari must allege and prove its readiness, willingness and ability to perform under the terms of the credit, the Court notes that Atari has made a sufficient showing. By presenting a conforming draw before the credit expired, Atari has demonstrated that it was ready, willing and able to perform as required by the credit terms. There is no countervailing evidence offered by Harris to indicate that Atari was not ready, willing and able to perform.

Moreover, under Article Five of the UCC, it is not clear that Atari is required to show that it was ready, willing and able to perform. Section 5–115(2) expressly contemplates a situation where the beneficiary may sue the issuer for repudiation and still "avoid procurement of the required documents." In other words, there is no requirement that the beneficiary demonstrate that it could present a conforming draw. *But see Reprosystem, B.V. v. SCM Corp.*, 522 F.Supp. 1257, 1278 (S.D.N.Y.1981), *rev'd on other grounds*, 727 F.2d 257 (2d Cir.1983); *Nikkei International*, 497 F.Supp. 893, 908–9 (as to a plaintiff then not ready to perform and also incapable of ever becoming ready to perform).

That is not to say that the beneficiary's ability to present a conforming draw or obtain the requisite documents has no bearing on the action for repudiation. Where, as here, a beneficiary to a standby credit sues for repudiation, the amount of damages recoverable depends on the beneficiary's ability to present a conforming draw and the amount of that draw. Since

---

(b) recover damages for non-delivery as provided in this Article (Section 2–713).

(2) Where the seller fails to deliver or repudiates the buyer may also

(a) if the goods have been identified recover them as provided in this Article (Section 2–502); or

(b) in a proper case obtain specific performance or replevy the goods as provided in this Article (Section 2–716).

**4.** Harris also contends that because Atari replied to Harris' December 22nd repudiation by stating that it regarded the credit as remaining in effect until its expiry date, Atari waived the repudiation. However, Ill.Rev.Stat.1981, ch. 26, § 2–610 allows a party in Atari's position to notify the repudiating party that performance is still expected and yet not waive any remedy for breach. Thus, Atari's letter to Harris did not waive any remedy for the breach.

Atari extended only $395,391.68 of credit that was secured by the letter of credit, that amount is all that can be recovered. The "windfall" to which Harris points would result only if Atari could recover more than the $395,391.68 it could legitimately have drawn on the credit, absent Harris' repudiation. Accordingly, Atari has established a valid claim for repudiation, based on Harris' letter of December 22, 1982.

However, it remains to be seen whether Atari gave up its claim by presenting its draw to Harris on January 31, 1984. Harris contends that Atari's presentment brings into play the second sentence of § 5–115(2). Since Atari would, therefore, have "an immediate right of action for wrongful dishonor" which essentially duplicates Count III, Harris argues, Atari has waived its repudiation claim. This argument is not without force. But reducing Atari's repudiation claim to a wrongful dishonor claim would again engraft the issue of Atari's ability to perform unto Atari's repudiation claim. Rather, Atari's presentment is no more than a further urging that Harris retract its repudiation and perform under the credit.

If proper, Harris' dishonor of Atari's attempted draw, citing nonconformities with the terms of the credit, would amount to such a retraction of its prior repudiation. Ill.Rev.Stat.1981, ch. 26, § 2–611.[5] Had Harris responded to Atari's attempt to draw on the credit with a flat denial that the credit remained effective, Atari would still have its repudiation claim. By dishonoring Atari's draw without reliance upon the credit terms, Harris clearly would be persisting in its prior repudiation. Instead, Harris can be viewed as accepting Atari's second invitation to retract its December 22nd repudiation by performing its obligations under the credit. This would "clearly indicate to the aggrieved party that the repudiating party intends to perform." Section 2–611(2).

But Atari maintains that Harris' reliance upon the credit terms was merely a pretext. Atari contends that Harris' dishonor was actually based on Harris' position that the credit was no longer effective. Accepting Atari's argument necessarily leads to the conclusion that whenever an issuer has repudiated a letter of credit and its subsequent dishonor is ultimately determined to be wrongful by a court, the issuer is subject to liability under a theory of anticipatory breach as well as for the wrongful dishonor. Although this result provides a disappointed beneficiary with duplicate causes of action, this is exactly the result contemplated by the Official Comments to the UCC. "Note that wrongful dishonor of a draft for a portion of the credit is dishonor of the credit under Section 5–112(1), *and makes applicable subsection (2) of this section as well as subsection (1)."* UCC Comment to § 5–115, ¶ 2. Nor does this result do violence to those decisions requiring a beneficiary to meet the requirements of the credit should it attempt to draw on the credit after a repudiation. *See, e.g., Nikkei International, supra; Ufitec, supra.* Only a wrongful dishonor, which necessarily includes a conforming draw, should be viewed as a continued repudiation. Should the issuer properly dishonor an attempted draw made subsequent to its repudiation, it has performed under the credit and retracted its repudiation. In light of the foregoing, Atari's motion for summary judgment as to liability on Count III must also be granted.

**5.** Section 2–611. Retraction of Anticipatory Repudiation.

(1) Until the repudiating party's next performance is due he can retract his repudiation unless the aggrieved party has since the repudiation cancelled or materially changes his position or otherwise indicated that he considers the repudiation final.

(2) Retraction may be by any method which clearly indicates to the aggrieved party that the repudiating party intends to perform, but must include any assurance justifiably demanded under the provisions of this Article (Section 2–609).

(3) Retraction reinstates the repudiating party's rights under the contract with due excuse and allowance to the aggrieved party for any delay occasioned by the repudiation.

IT IS THEREFORE ORDERED that summary judgment of liability will enter in favor of Atari, Inc. and against Harris Trust & Savings Bank on Counts II and III, as a result of which a money judgment will be entered in the amount of $395,391.68 in favor of plaintiff Atari, Inc. and against the defendant Harris Trust and Savings Bank.