POSNER, Circuit Judge.
A supplier terminated a distributor, who sued for breach of contract and got a preliminary injunction. The supplier has appealed under 28 U.S.C. § 1292(a)(1). The appeal raises issues of procedure and contract law.
The supplier, Hospital Products (as we shall call the affiliated corporations that are the defendants), a small firm now undergoing reorganization in bankruptcy, is one of the world’s two principal manufacturers of “reusable surgical stapling systems for internal surgical procedures” (“surgical stapling systems,” for short). The terminated distributor, American Hospital Supply Corporation, the world’s largest distributor of medical and surgical supplies, in 1982 became the exclusive distributor in the United States of Hospital Products’ surgical stapling systems. The contract of distribution was for three years initially, but provided that it would be renewed automatically for successive one-year periods (to a limit of ten years) unless American Hospital Supply notified Hospital Products at least 90 days before the three years were up (or any successive one-year period for which the contract had been renewed) that it wanted to terminate the contract; and this meant, by June 3, 1985.
On that day Hospital Products hand-delivered a letter to American Hospital Supply demanding to know whether it intended to renew the contract and reminding it that if it failed to respond by the end of the day this would mean that the contract had been renewed. American Hospital Supply responded the same day in a letter which pointed out that since it wasn’t terminating, the contract was, indeed, renewed. But on the next day Hospital Products announced that it was going to treat the contract as having been terminated, and on June 7 it sent a telegram to American Hospital Supply’s dealers informing them that effective June 3 American Hospital Supply was “no longer the authorized distributor of [Hospital Products’] stapling products.”
American Hospital Supply forthwith brought this diversity breach of contract suit against Hospital Products and moved for a preliminary injunction, which was granted on July 8 after an evidentiary hearing. The injunction forbids Hospital *593 Products to take any action in derogation of American Hospital Supply’s contract rights so long as the injunction is in force (i.e., pending the outcome of the trial). It also requires Hospital Products to notify American Hospital Supply’s dealers that American Hospital Supply is still Hospital Products’ authorized distributor, and this has been done. Hospital Products counterclaimed, alleging breach of contract, fraud, and unfair competition.
Two months after the entry of the injunction, Hospital Products, which had been in parlous financial state even before this litigation began, filed a petition for bankruptcy under Chapter 11 of the Bankruptcy Act (reorganization). The bankruptcy court suspended the automatic stay of litigation against a bankrupt, see 11 U.S.C. §§ 362(a), (d); 2 Collier on Bankruptcy ¶¶ 362.04[1], 362.07 (15th ed., King ed., 1985), to permit this appeal. Hospital Products moved the bankruptcy court to disaffirm (i.e., cancel) the renewed contract that went into effect on September 1, 1985, upon the expiration of the original contract. Its ground was that the renewed contract was still executory when Hospital Products declared bankruptcy, and hence was subject to disaffirmance under 11 U.S.C. § 365. See In re Minges, 602 F.2d 38, 41 (2d Cir.1979). The bankruptcy court has not yet acted on the motion. Hospital Products has not asked the district court to dissolve the preliminary injunction on the basis of events, notably the bankruptcy, since the injunction was entered.
A district judge asked to decide whether to grant or deny a preliminary injunction must choose the course of action that will minimize the costs of being mistaken. Because he is forced to act on an incomplete record, the danger of a mistake is substantial. And a mistake can be costly. If the judge grants the preliminary injunction to a plaintiff who it later turns out is not entitled to any judicial relief— whose legal rights have not been violated— the judge commits a mistake whose gravity is measured by the irreparable harm, if any, that the injunction causes to the defendant while it is in effect. If the judge denies the preliminary injunction to a plaintiff who it later turns out is entitled to judicial relief, the judge commits a mistake whose gravity is measured by the irreparable harm, if any, that the denial of the preliminary injunction does to the plaintiff.
These mistakes can be compared, and the one likely to be less costly can be selected, with the help of a simple formula: grant the preliminary injunction if but only if P X HP > (1 - P) X Ha, or, in words, only if the harm to the plaintiff if the injunction is denied, multiplied by the probability that the denial would be an error (that the plaintiff, in other words, will win at trial), exceeds the harm to the defendant if the injunction is granted, multiplied by the probability that granting the injunction would be an error. That probability is simply one minus the probability that the plaintiff will win at trial; for if the plaintiff has, say, a 40 percent chance of winning, the defendant must have a 60 percent chance of winning (1.00 - .40 = .60). The left-hand side of the formula is simply the probability of an erroneous denial weighted by the cost of denial to the plaintiff, and the right-hand side simply the probability of an erroneous grant weighted by the cost of grant to the defendant.
This formula, a procedural counterpart to Judge Learned Hand’s famous negligence formula, see United States v. Carroll Towing Co., 159 F.2d 169, 173 (2d Cir.1947); United States Fidelity & Guaranty Co. v. Jadranska Slobodna Plovidba, 683 F.2d 1022, 1026 (7th Cir.1982), is not offered as a new legal standard; it is intended not to force analysis into a quantitative straitjacket but to assist analysis by presenting succinctly the factors that the court must consider in making its decision and by articulating the relationship among the factors. It is actually just a distillation of the familiar four (sometimes five) factor test that courts use in deciding whether to grant a preliminary injunction. The court asks whether the plaintiff will be irreparably harmed if the preliminary injunction is denied (sometimes also whether the plain *594 tiff has an adequate remedy at law), whether the harm to the plaintiff if the preliminary injunction is denied will exceed the harm to the defendant if it is granted, whether the plaintiff is reasonably likely to prevail at trial, and whether the public interest will be affected by granting or denying the injunction (i.e., whether third parties will be harmed — and these harms can then be added to HP or Ha as the case may be). See, e.g., Palmer v. City of Chicago, 755 F.2d 560, 576 (7th Cir.1985). The court undertakes these inquiries to help it figure out whether granting the injunction would be the error-minimizing course of action, which depends on the probability that the plaintiff is in the right and on the costs to the plaintiff, the defendant, or others of granting or denying the injunction. All this is explained at length in Roland Machinery Co. v. Dresser Industries, Inc., 749 F.2d 380, 382-88 (7th Cir.1984), where a panel of this court applied the verbal counterpart to our algebraic formula, as did a different panel in Maxim’s Ltd. v. Badonsky, 772 F.2d 388, 391 (7th Cir.1985). See also Leubsdorf, The Standard for Preliminary Injunctions, 91 Harv.L.Rev. 525 (1978). The formula is new; the analysis it capsulizes is standard.
The formula does not depend on the legal basis of the plaintiffs claim, whether it is antitrust law (Roland) or trademark law (Badonsky) or, as here, the common law of contract, although the nature of the right asserted by the plaintiff may affect the weighting of the harms, see, e.g., Shondel v. McDermott, 775 F.2d 859, 866-67 (7th Cir.1985). So may the nature of the permanent remedy to which the plaintiff would be entitled if he prevailed at trial. For example, prevailing parties in breach of contract cases normally are not awarded specific performance, that is, a mandatory injunction to perform. Since many breaches of contract are involuntary, implying that performance would be very costly, routinely ordering specific performance would create situations where the defendant was forced to bargain desperately to buy his way out of the injunction. The high bargaining costs that would result are a deadweight cost of equitable relief. To the extent that those costs attend a preliminary injunction, they are of course relevant to the decision whether to issue such an injunction. But the formula takes account of this; the case we have described would be one where the harm to the defendant from granting the injunction would be very great. Thus the fact that a plaintiff might have no hope of getting specific performance ordered at the conclusion of the trial need not prevent him from obtaining a preliminary injunction. Cf. Roland v. Dresser Industries, Inc., supra, 749 F.2d at 386. The premise of the preliminary injunction is that the remedy available at the end of trial will not make the plaintiff whole; and, in a sense, the more limited that remedy, the stronger the argument for a preliminary injunction — provided the remedy is not limited for reasons that would make a preliminary injunction equally inappropriate.
As explained in Roland, the scope of judicial review of a district judge’s decision to grant or deny a preliminary injunction is limited. See 749 F.2d at 384-85, 388-91. The usual formulation is that the decision will be reversed only if it is found to be an “abuse of discretion.” Unfortunately this phrase covers a family of review standards rather than a single standard, and a family whose members differ greatly in the actual stringency of review. See, e.g., id. at 388-91; Metlyn Realty Corp. v. Esmark, Inc., 763 F.2d 826, 831-32 (7th Cir.1985); Friendly, Indiscretion About Discretion, 31 Emory L.J. 747 (1982). For example, when we review an order granting or denying a preliminary injunction, we do not do so with as much deference (virtually complete deference) as when reviewing a criminal sentence that is within legal limits but is challenged as too harsh; we do “not simply engage in a perfunctory rubber-stamping of the district court’s decision.” Olin Water Services v. Midland Research Laboratories, Inc., 774 F.2d 303, 307 n. 7 (8th Cir.1985). But we do give that decision substantial deference, bearing in mind that the district judge had *595 to act in haste, that he had to balance factors which, though they can be related in a neat formula, usually cannot be quantified, and that in dealing with the parties and their witnesses and counsel in the hectic atmosphere of a preliminary-injunction proceeding the judge may have developed a feel for the facts and the equities that remote appellate judges cannot obtain from a transcript. To reverse an order granting or denying a preliminary injunction, therefore, it is not enough that we think we would have acted differently in the district judge’s shoes; we must have a strong conviction that he exceeded the permissible bounds of judgment. And although recognizing that the order granting such an injunction must set forth the judge’s reasons, see Fed.R.Civ.P. 65(d), we also recognize that the haste with which the judge must act precludes as full a statement of reasons as could reasonably be demanded of a final decision.
We have now to apply these precepts, and we begin with the balance of harms. Hospital Products points out, irrelevantly as it seems to us, that American Hospital Supply did not prove more than a handful of lost sales as a result of the mailgram of June 7 which announced the termination of American Hospital Supply’s distributorship to its dealers. The reason Is simply that American Hospital Supply promptly asked for and promptly received a preliminary injunction to head off any losses by restoring its distributorship. The question is not whether there was an actual loss but whether there was an impending loss that the preliminary injunction prevented, how great it was, and whether it could have been made up by a judgment for damages after trial.
Although American Hospital Supply was able to replace Hospital Products’ line of surgical stapling systems in the interval between the mailgram of June 7 and the entry of the preliminary injunction a month later, the mailgram, unless retracted as ordered by the injunction, might have impaired American Hospital Supply’s goodwill, a factor emphasized in other cases where terminated dealers sought preliminary injunctions, see, e.g., Menominee Rubber Co. v. Gould, Inc., 657 F.2d 164, 167 (7th Cir.1981). The suddenness of the termination and the urgent mode of announcement might have made the dealers think that American Hospital Supply must have engaged in unethical or unreasonable conduct. We do not put much weight on this point, however. It is speculative, and any harm may have been cured by the retraction, in which event the harm could not support the rest of the injunction.
But in addition, on June 7 American Hospital Supply was holding a large unsold inventory of Hospital Products’ surgical stapling systems. To help Hospital Products overcome serious financial problems, American Hospital Supply had advanced it millions of dollars — part in loans, part by buying more of the product than it needed and keeping the excess in inventory. The mailgram jeopardized its investment because dealers might be reluctant to buy Hospital Products’ goods from American Hospital Supply, not wanting to become enmeshed in a legal dispute between it and its supplier or perhaps even fearing that there might be some defect in the particular items being sold by American Hospital Supply. True, its investment would probably not be totally wiped out. American Hospital Supply might be able to sell the product to its dealers immediately at a sharp mark-down or with extra warranties or with promises of indemnity; or if it waited till it prevailed on the merits against Hospital Products, at no mark-down, in which event its loss would be just the interest and storage costs of keeping the product in inventory longer than expected. (If it didn’t prevail, its losses would not be recoverable anyway.) No effort was made to quantify the loss to American Hospital Supply caused by the alleged breach of contract. But in the nature of things reliable estimation may have been infeasible; and since the estimates of the size of the unsold inventory range from $10 million to almost $30 million, probably the threatened loss was substantial.
*596 What made the loss (whatever exactly it was in dollar terms) irreparable was not only or mainly the difficulty that American Hospital Supply might encounter down the road in quantifying its loss, although this difficulty has been stressed in other cases where a distributor sought a preliminary injunction in part to protect goodwill, see, e.g., Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Mfg. Co., 550 F.2d 189, 197 (4th Cir.1977); it was Hospital Products’ insolvency, which was apparent when the district judge granted the preliminary injunction, even though the firm had not yet declared bankruptcy. The victim of a breach of contract, certainly one committed before the contract breaker declares bankruptcy, is just another general creditor, see In re Minges, supra, 602 F.2d at 41, and it is well known that general creditors fare poorly in most bankruptcy proceedings. This is true whether the proceeding ends in liquidation or in reorganization, though as a matter of fact most bankruptcies that start in reorganization nonetheless end in liquidation. Maybe, as Hospital Products argues, if only it could get the injunction lifted it would soon recover its solvency, even to the point of being able to pay any damages that American Hospital Supply is awarded in the trial of this case. But if Hospital Products really believes that, it ought to have gone to the district judge and asked him to dissolve the injunction, and it did not — an omission that makes us profoundly skeptical of Hospital Products’ claim that the grant of the injunction precipitated its declaration of bankruptcy.
Although a defendant’s insolvency is a standard ground for concluding that a plaintiff’s harm if the preliminary injunction is denied will not be cured by an award of damages at the end of the trial, see Roland Machinery Co. v. Dresser Industries, Inc., supra, 749 F.2d at 386; Signode Corp. v. Weld-Loc Systems, Inc., 700 F.2d 1108, 1111 (7th Cir.1983), we must ask whether the cases that accept it give enough weight to the policies of bankruptcy law. To use the defendant’s insolvency as a reason for granting the plaintiff an injunction now rather than making him wait for damages till the end of the trial may seem to give the plaintiff a preference in the distribution of the defendant’s assets and thus impose harms on third parties, the defendant’s other creditors. The responsibility for assessing those harms, however, has been placed in the bankruptcy court (which in this case happens to be in Connecticut) rather than the court asked to grant a preliminary injunction. Ordinarily the bankruptcy court can, just by not granting a motion to lift the automatic stay of litigation against the bankrupt, prevent a creditor from seeking the “preference” represented by the grant of a preliminary injunction in the creditor’s favor. That course was ruled out here by the fact that the injunction was granted before bankruptcy was declared; it was the bankrupt that moved to lift the automatic stay, so that it could appeal. The bankruptcy court can still protect the creditors, however, by disaffirming the renewed contract. We assume that disaffirmance (at least if upheld on appeal) would cause the district judge to dissolve the preliminary injunction, as it would show that American Hospital Supply had no legal basis for complaining about the termination of the contract after it was renewed but before it was even partially executed.
We conclude that there was a threat of irreparable harm to the plaintiff; and although the dollar amount of that harm is not known with any precision and we hesitate to call it great, it seems substantial. We must next consider the irreparable harm to the defendant from the injunction. The district judge found there would be none, because American Hospital Supply— which has billions of dollars in sales and earns substantial profits — will be good for any money judgment that Hospital Products may obtain on its counterclaim. This ground is not entirely satisfactory. There is a difference between the damages caused Hospital Products by the breach of contract or other (alleged) misconduct committed by American Hospital Supply before this suit began, damages which we may *597 assume American Hospital Supply is good for, and damages caused Hospital Products by the preliminary injunction — that is, by an order fastening Hospital Products to American Hospital Supply for another year. Those are not the damages that Hospital Products seeks to recover on its counterclaim; and while there may be considerable overlap between the injunction damages and the counterclaim damages, we cannot say that the overlap is complete.
But we may not overlook the bond that a plaintiff who obtains a preliminary-injunction is required to post (see Fed.R. Civ.P. 65(e)) and that this plaintiff did post, in an amount, $5 million, whose adequacy Hospital Products does not challenge. Again it can be argued that damages may be hard to prove. The injunction bond merely puts a ceiling on damages — they must still be proved. See Coyne-Delany Co. v. Capital Development Bd., 717 F.2d 385, 391-94 (7th Cir.1983). But the irreparability that comes from the difficulty of proving damages is not of the same order as that which comes from the uncollectibility of a damage judgment. The award of damages in a case where injury is difficult to measure is as likely to overcompensate as to undercompensate the injured party. When a court speaks of damages as being “irreparable” because they are difficult to measure it can mean only that confining the injured party to a remedy of damages creates a risk he may not like (because he is risk averse — the disposition that leads people to buy insurance), even though the upside risk is as large as the downside risk. That is, the plaintiff is as likely to do better than he expects as he is to do worse, but he would lose more utility by losing big than he would gain utility by winning equally big. So there is a harm, but probably not a big one. The specific harms to which the Second Circuit referred in Jack Kahn Music Co. v. Baldwin Piano & Organ Co., 604 F.2d 755, 764 (2d Cir.1979), in explaining why a supplier should not be forced by a preliminary injunction to continue a dealership, are not alleged here.
But what of the fact that an award of damages on the injunction bond, even if it made Hospital Products’ creditors whole (and it might not), might not come in time to save the company itself? Many reorganizations in bankruptcy end in liquidation, and Hospital Products’ reorganization may end there too, before the case is tried on the merits and therefore before the injunction bond can be enforced; and even if the company is successfully reorganized, the shareholders may be wiped out, and all the stock come into the hands of creditors. But the full financial losses to Hospital Products’ shareholders from the bankruptcy are not the correct measure of the harm from granting the injunction. Bankruptcy is not, not intentionally anyway, a device for reducing wealth, but a device for distributing the impact of a business failure over various claimants to the bankrupt’s assets. The costs that bankruptcy imposes, as distinct from the costs that the underlying failure imposes, are therefore merely the costs of administering the bankruptcy proceeding. Nevertheless these costs are not negligible. See, e.g., Ang, Chua & McConnell, The Administrative Costs of Corporate Bankruptcy: A Note, 37 J.Fin. 219 (1982); Altman, A Further Empirical Investigation of the Bankruptcy Cost Question, 39 J.Fin. 1067 (1984). Although the expenses of administration are paid to someone — to lawyers, accountants, etc. — they are paid for time that would have value elsewhere; and that value is a deadweight loss from bankruptcy, as it cannot be recovered by a payment of damages to the bankrupt estate. A preliminary injunction that will or may precipitate a firm into bankruptcy is therefore a source of costs which ought to be considered in deciding whether to grant such an injunction.
A related and often more significant type of cost, but one whose implications for legal policy are more ambiguous, is the cost of the business failure itself. If the firm’s assets would be worth less on the auction block than as part of a going concern, this might seem a powerful argument against granting a preliminary injunction *598 that increased the risk of failure. It is not a complete answer to point out that the creditors will get the benefit of any injunction damages awarded the bankrupt; those damages may not offset the loss of going-concern value. But since business failure provides social as well as private benefits— provides, indeed, the essential discipline of the capitalist system — it seems questionable to give firms that conduct their affairs in an unduly risky or careless manner an advantage in litigation. A more mundane point is that Hospital Products should have asked for a bigger injunction bond if it thought the injunction might play the role of the proverbial nail for want of which the kingdom was lost.
We need penetrate no further into this maze; it is enough that the effect of a preliminary injunction in precipitating insolvency is a factor arguing against the grant of the injunction (how strongly we shall not have to decide). Reflection on this overlooked point might conceivably persuade the district judge to grant a motion to dissolve the preliminary injunction, should such a motion be made, as it can be at any time. See, e.g., Winterland Concessions Co. v. Trela, 735 F.2d 257, 259-60 (7th Cir.1984). But it does not persuade us that the preliminary injunction was in error. It does not even persuade us that the district judge erred in concluding that the balance of harms inclined in favor of granting the preliminary injunction. Keep in mind that when the district judge acted, Hospital Products had not yet declared bankruptcy. The judge thought the injunction bond might tide the company over the crisis; he also pointed out (and this has great relevance to the issue of American Hospital Supply’s chances of winning the case on the merits, of which more presently) that American Hospital Supply had loaned millions of dollars to Hospital Products to prevent the latter from going broke.
We attach no legal significance to the difference in the size of the parties. Although American Hospital Supply is a giant and Hospital Products a pygmy, we cannot think what legal difference that makes. We have taken an oath to do justice to rich and poor alike — and anyway one can’t tell merely from the relative size of two corporations what the relative wealth of their shareholders is. Relative size is relevant where, as in Machlett Laboratories, Inc. v. Techny Industries, Inc., 665 F.2d 795, 798 (7th Cir.1981); Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1205 (2d Cir.1970) (Friendly, J.), and Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co. of New York, Inc., 749 F.2d 124 (2d Cir.1984) (per curiam), one party, being small and weak, faces bankruptcy if the preliminary injunction is granted or denied; for bankruptcy imposes social costs, as we have seen. See Sperry Int’l Trade, Inc. v. Government of Israel, 670 F.2d 8, 12 (2d Cir.1982). But we have already considered the issue of bankruptcy risk.
As a matter of fact it could be argued that the relative size of the companies, viewed separately from the issue of bankruptcy costs, strengthens the case for the preliminary injunction. American Hospital Supply might suffer an irrecoverable loss of many millions of dollars if the injunction is denied it; Hospital Products’ small size puts a cap on its loss of $5 million if the injunction bond was computed correctly. But we shall not pursue this interesting issue. Even if there were no clear basis for differentiating between the irreparable harms to American Hospital Supply from denying and to Hospital Products from granting a preliminary injunction, in which event those harms would have to be treated as equal, Hospital Products’ appeal would fail. If the harms to the plaintiff and the defendant of denying and granting the injunction, respectively, are equal, the injunction must be granted if the plaintiff has a better than 50 percent chance of winning the case, for then P in our preliminary-injunction formula must exceed 1 - P, and therefore P X HP must exceed (1 - P) X Ha from the assumption that HP = Ha.
The district judge was persuaded that Hospital Products, not American Hospital Supply, had broken the contract, implying a *599 very high P. He undoubtedly was correct if the contract was renewed on June 3 and in force the next day when Hospital Products announced that the contract was terminated. But we must consider as did he whether American Hospital Supply repudiated the contract before this announcement. That would make this a case of anticipatory breach of contract — American Hospital Supply indicates that it will not perform its obligations under the renewed contract, Hospital Products therefore treats the contract as terminated. Hospital Products points to a letter from American Hospital Supply which threatens to end financial assistance to Hospital Products and call its loans unless Hospital Products agrees to modify the contract in American Hospital Supply’s favor. American Hospital Supply responds with much show of reason that it had advanced millions of dollars to Hospital Products beyond anything that it was contractually obligated to do, and therefore had every right to condition the making of new loans or the extension of existing ones on contract concessions. Hospital Products says that no loans were due and what the letter referred to as financial assistance was a euphemism for money due on goods sold and delivered — to which another round of replies asserts that if no loans were due, Hospital Products had nothing to worry about and that American Hospital Supply actually had bought far more surgical stapling products from Hospital Products than it needed or was contractually obligated to buy, so that what looked like payment on the contract really was financial assistance.
This legal badminton is inconclusive; but as nearly as we can determine, the able and experienced district judge who resolved the uncertainty in American Hospital Supply’s favor was on solid ground in doing so. Although his discussion of the merits of the parties’ contract dispute was not extensive, we remind the reader of our earlier point that a district judge forced to act in haste on an application for a preliminary injunction will not be reversed merely because the reasons he gives are not so full as could properly be demanded of an order granting a permanent injunction or otherwise resolving a full trial on the merits.
Hospital Products was a deeply troubled company to which American Hospital Supply provided financial aid essential in keeping it afloat — not out of altruism, of course, but because it liked Hospital Products’ product. Hospital Products acknowledges that American Hospital Supply is its largest creditor. Naturally American Hospital Supply wanted to recoup its investment and it had every right to condition further assistance on whatever concessions it could extract. There is nothing unlawful about offering a benefit to a promisee in exchange for a modification of the contract; the problematic modifications are those not supported by consideration. Thus a buyer who owes money to a financially distressed seller for goods sold and delivered and withholds it in order to force a modification of the contract without fresh consideration is guilty of duress, and the modification will not be enforced. See, e.g., Selmer Co. v. Blakeslee-Midwest Co., 704 F.2d 924 (7th Cir.1983). But there was no modification here. Whatever concessions American Hospital Supply may have wanted to extract from Hospital Products, on June 3 on Hospital Products’ invitation it renewed the contract on its original terms.
If when doing so American Hospital Supply had indicated that it would not honor the terms of the contract but would force Hospital Products into a deeper and deeper hole by refusing to pay for goods bought and received, Hospital Products would be entitled to terminate the contract as a measure of self-help. If you commit a material breach of contract, the other party can walk away from the contract without liability, and can do so as soon as you announce your intentions even if the time for the performance that you have repudiated hasn’t arrived. See, e.g., B & C Electric, Inc. v. Pullman Bank & Trust Co., 96 Ill.App.3d 321, 328, 51 Ill.Dec. 698, 703, 421 N.E.2d 206, 211 (1981); Farnsworth, Contracts § 8.22, at p. 637 (1982); cf. Ca *600 sio, Inc. v. S.M. & R. Co., 755 F.2d 528, 532 (7th Cir.1985). On this issue the key evidence for Hospital Products is the two letters that American Hospital Supply sent it on June 3. One is the letter in which American Hospital Supply in response to Hospital Products’ demand to indicate whether the contract would be renewed made clear that it was not exercising its right of cancellation and therefore the contract was renewed. But the letter also states an “understanding” of the contract by American Hospital Supply that Hospital Products asserts is a clear indication of an intention not to abide by its terms, specifically, not to buy as much as American Hospital Supply was obligated to do during the period of renewal. American Hospital Supply responds that it had bought all it was contractually obligated to buy during the renewal term already, in advance as it were, to help Hospital Products with its cash-flow problems. Whether this is true is a difficult question that depends not only on collating a mass of documents but on resolving a clash of testimony, which only the judge who heard the testimony can do.
The same is true with regard to American Hospital Supply’s other letter of June 3, the one referring to financial assistance, wherein Hospital Products finds a veiled threat not to pay for goods already bought unless it agreed to modify the contract in American Hospital Supply’s favor. The letter does not say this, however; and the district judge, who listened to several witnesses as well as reading the various documents submitted by the parties, concluded that the renewal was unconditional and that while the parties may have differed with regard to their understanding of the extent of American Hospital Supply’s obligations under the contract, American Hospital Supply’s refusal to accede to Hospital Products’ unilateral understanding was not a repudiation of the contract. This finding is not clearly erroneous and the legal principle that underlies it — the principle that it is not a breach of contract to refuse to accept the other party’s interpretation of the contract — is unexceptionable, see, e.g., Farwell Construction Co. v. Ticktin, 84 Ill.App.3d 791, 800-01, 39 Ill.Dec. 916, 923-24, 405 N.E.2d 1051, 1058-59 (1980). Since, moreover, the finding was based on all the evidence we can think of that the parties might present at the actual trial on the merits, the chances that the judge was wrong and that his preliminary findings will be reversed at trial are small, and the probability of the plaintiff’s prevailing at trial correspondingly greal. In thus commenting on the merits, however, as we must do to review the district court’s action in granting the injunction, we do not mean to prejudge the outcome of the full trial, which may cast the facts in a different light from how they appeared in the preliminary injunction proceeding. This caveat applies to all the discussion of the merits of the case in this opinion.
Before concluding that the grant of the preliminary injunction should be affirmed, we must consider Hospital Products’ argument that the injunction should have been denied because of American Hospital Supply’s “unclean hands” in advertising Hospital Products’ line of surgical stapling products as its own; and a related argument that the grant of the injunction disserved the public interest.
Although the contract forbade American Hospital Supply to sell products competitive with Hospital Products’ line during the term of the contract, American Hospital Supply developed, but did not (before the mailgram of June 7) sell, its own line. Hospital Products argues that in order to pave the way for dealers to switch to American Hospital Supply’s line as soon as it reached the market, American Hospital Supply passed off Hospital Products' line as its own in its advertising.
If merely developing a competing line of products were a violation of the contract, then American Hospital Supply’s conduct in developing and by devious means promoting a competing line (if indeed American Hospital Supply engaged in false advertising, a hotly contested and unresolved issue) would be relevant to the question who broke the contract first, and *601 hence to the likelihood of American Hospital Supply’s prevailing at trial on its breach of contract claim. But the contract does not foi'bid development of competing products. Or if Hospital Products were accusing American Hospital Supply of misbranding Hospital Products’ line and thereby impairing Hospital Products’ trademarks, this would be highly relevant to the question who broke the contract first, since it is a most serious violation of the implied contractual duty of good faith for a distributor to misbrand his supplier’s product, whether by selling someone else’s product under the supplier’s name or the supplier’s product under someone else’s name (including the distributor’s). See discussion in Lippo v. Mobil Oil Corp., 776 F.2d 706, 722-25 (7th Cir.1985) (dissenting opinion). But we do not understand Hospital Products to be arguing that. Its argument is that even if American Hospital Supply made out an ironclad case that Hospital Products alone violated the distribution contract, the doctrine of unclean hands forbade the grant of a preliminary injunction.
The doctrine applies to preliminary injunctions as to other equitable remedies, of course, but as we have been at pains to emphasize in two recent cases, the doctrine is not to be used as a loose cannon, depriving a plaintiff of an equitable remedy to which he is otherwise entitled merely because he is guilty of unrelated misconduct. See Shondel v. McDermott, supra, 775 F.2d at 867-69; Polk Bros., Inc. v. Forest City Enterprises, Inc., 776 F.2d 185, 193 (7th Cir.1985). To deny the preliminary injunction because American Hospital Supply was using false advertising to supplant Hospital Products as a maker of surgical stapling systems, as Hospital Products urges, would be to deny it for a reason unrelated to Hospital Products’ alleged breach of contract in terminating American Hospital Supply as a distributor after the contract was renewed. By renewing the contract American Hospital Supply disabled itself for another year from selling in competition with Hospital Products. Denying the injunction would merely have accelerated the entry of American Hospital Supply into making a line of products previously dominated by Hospital Products and one other producer. It must not be forgotten that the contract which American Hospital Supply wants to enforce and Hospital Products wants to walk away from is an exclusive-dealing contract, with .American Plospital Supply the dealer and Hospital Products the supplier. So long as the contract is in effect, American Hospital Supply is barred from competing with Hospital Products. Thus we do not see how an injunction that keeps the contract in effect for another year, or perhaps longer (more on this shortly), can be resisted on the basis that American Hospital Supply is trying to compete unfairly with Hospital Products.
Last, Hospital Products argues that the injunction is against the public interest. All such an argument means, as we said earlier, is that the injunction has effects on nonparties, in this case the members of the consuming public, which is to say the hospitals that are the ultimate purchasers of surgical stapling systems. Of course these effects must be taken into account in deciding whether to issue the injunction; when as here they are urged as reasons against the grant of the injunction, they are part of Hd in our formula, that is, they are part of the harm (to the defendant — but also to anyone else adversely affected) if the injunction is granted. If the injunction had been denied, Hospital Products would have sold its products directly to dealers in the United States, and American Hospital Supply presumably would have sold its newly developed line to dealers, too, thus increasing the number of competing producers from two to three. From this it can be argued that renewal of the contract was anti-competitive because it has postponed American Hospital Supply’s entry into the market as a competitor of Hospital Products. If “reusable surgical stapling systems for internal surgical procedures” constitute an economically meaningful market — meaning that if the producers colluded expressly or tacitly, they could raise the price of the product significantly without *602 experiencing such a drastic loss of sales (as customers switched to substitutes, or producers of other products switched to making this product) as to make the price increase unprofitable — Hospital Products might have a winning argument; it is easier for two firms to collude without being detected than for three to do so. But Hospital Products has not tried to show that its product constitutes a genuine market and hence that there is a real danger of collusion; perhaps it has not tried to do so because it would be pointing to itself as one of the two colluders.
Another way to take Hospital Products’ argument, however, is that the injunction weakens competition by keeping Hospital Products, not American Hospital Supply, out of the market. But if only because of American Hospital Supply’s interest in liquidating its large unsold inventory of Hospital Products’ goods, it is hardly likely that the injunction will in fact keep Hospital Products out of the market in any sense relevant to the concerns of antitrust policy. With all the discord between the parties, it is still the case that American Hospital Supply wants to sell off its inventory of Hospital Products’ goods, necessarily in competition with those of the other producer. Even when that inventory is completely sold off, American Hospital Supply will be contractually obligated to buy from Hospital Products until the contract lapses; and what it buys, economic logic compels it to sell — especially since, so long as the contract continues to be renewed, American Hospital Supply, being forbidden to sell competing products, will have no choice but to promote Hospital Products’ line as vigorously as it can. All this will keep Hospital Products in the market.
We comment briefly on the term of the preliminary injunction. Since federal litigation is sometimes protracted and since the contract entitles American Hospital Supply to renew the contract annually for six more years after this year, there is a theoretical possibility that the injunction will remain in effect for many years. Over such a period the balance of harms and impact on the public interest may of course change. We trust that the district judge will.bear this in mind in considering any requests to modify the injunction.
Finally, we note that the parties and the district court may wish to consider the possibility that this lawsuit might be transferred to the district court in Connecticut in which the bankruptcy proceeding is pending, assuming the requirements of 28 U.S.C. § 1404(a) can be met. Cf. Lank v. Federal Ins. Co., 309 F.Supp. 349, 353 (D.Del.1970). Still another possibility might be the transfer of the bankruptcy proceeding to Chicago. See 28 U.S.C. § 1412. Either form of transfer might make it easier to ensure that this lawsuit is not handled in a way that would unfairly prejudice the interests of Hospital Products’ other creditors. We mean to imply no view on whether transfer (in either direction) might be possible or desirable, but it is something for the parties and the district judge to consider in their quest to do equity in this matter.
Affirmed.