**UNITED STATES of America,**
**Plaintiff-Appellant,**

v.

**TOWN OF CICERO, ILLINOIS,**
**Defendant-Appellee.**

No. 85–2513.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 26, 1986.

Decided March 20, 1986.

---

William Yeoman, Asst. Atty. Gen., U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellant.

Alan Rosen, Neistein, Richman, Hauslinger & Young, Chicago, Ill., for defendant-appellee.

Before BAUER and POSNER, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

BAUER, Circuit Judge.

The United States brought this Title VII action against the Town of Cicero challenging certain Cicero ordinances on the grounds that these ordinances discriminate against blacks. The ordinances prohibit anyone who has not lived in Cicero for a minimum number of years from applying for a municipal job. The United States sought a preliminary injunction to enjoin enforcement of the ordinances and the district court denied the motion. The case is now before us on an interlocutory appeal of the district court's denial of the government's motion. We vacate the district court's ruling because of its failure to properly apply the holding in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), and remand.

## I.

The United States filed this action on January 21, 1983, alleging, among other claims, that three ordinances enacted by the Town of Cicero, Illinois violate Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et seq.* Two of the ordinances require applicants for jobs as policemen and firemen to have been residents of Cicero for at least three years in order to be eligible for the job. The third ordinance requires applicants for all other municipal jobs to have been residents of Cicero for at least one year in order to be eligible for the job. On November 13, 1984 the United States moved for a preliminary injunction to enjoin enforcement of these three ordinances.

On July 3 and July 5, 1985 the district court heard testimony from both parties on the government's motion. The government presented statistical evidence to support its contention that the ordinances unfairly discriminated against blacks. Some of these statistics are as follows: that the labor force residing in Cicero was less than 0.05 percent black (14 blacks in a labor force of 29,228 workers), but that blacks comprise 20.7 percent of the work force of Cook County, where Cicero is located; that Cicero adjoins two predominantly black Chicago communities, North Lawndale (96.5 percent black) and Austin (73.8 percent black); that the thirty-eight private employers in Cicero

who filed EEOC statements in 1983 employed a work force that was 18.7 percent black; that of Cicero's 374 full time municipal employees, none are black; and that in its entire history, Cicero has never hired a single black person.

At these hearings, Cicero offered four non-discriminatory reasons for enacting the ordinances. First, Cicero contended that applicants for municipal jobs who had previously lived in Cicero would know the town better and therefore provide better services and be able to respond to emergencies more quickly. Second, employees living in the town would spend money there and lighten the tax burden of other residents. Third, requiring prior residence in Cicero would give the employees a stake in the community. Finally, by residing in Cicero the employees, particularly the policemen and firemen, would raise the morale of the community by making other residents feel more protected. Cicero also presented two studies to support its contention that it did not discriminate against blacks.

At the conclusion of the hearings, the trial judge denied the government's motion from the bench. The trial judge stated that the ordinances are "facially neutral" and also neutral in their operation because they completely exclude every non-resident of Cicero from applying for a municipal job regardless of the non-resident's race. TR. 339. Because of this fact, the trial judge concluded that the ordinances do not violate Title VII. TR. 344–45.

## II.

■ The government argues on appeal that the trial court did not apply the proper "disparate impact" analysis in evaluating its claim against Cicero. Cicero argues to the contrary, but both sides agree that the proper standard for evaluating disparate impact claims has been established by *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), and its progeny. *See, e.g., Connecticut v. Teal*, 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982). These cases have established a three part test for analyzing disparate impact claims. First, the plaintiff must show that a facially neutral employment practice has a disproportionate impact on members of a particular race, sex or national origin. The defendant must then show that the employment practice is manifestly related to the job in question, *Griggs*, 401 U.S. at 432, 91 S.Ct. at 854, or significantly serves some important business purpose. *See, e.g., New York Transit Authority v. Beazer*, 440 U.S. 568, 587 n. 31, 99 S.Ct. 1355, 1566 n. 31, 59 L.Ed.2d 587 (1979). If the defendant cannot make this showing, the plaintiff prevails. Even if this showing is made, however, the plaintiff may present evidence to show that the proffered nondiscriminatory reasons are pretextual and thereby succeed in proving illegal discrimination. *See, e.g., Connecticut v. Teal*, 457 U.S. at 447, 102 S.Ct. at 2530–31.

■ The government argues that the trial judge considered only the facial neutrality of the ordinances in denying its motion. Cicero argues that the trial judge properly applied *Griggs*. Cicero concludes that because the trial judge first heard evidence from the government, denied Cicero's "motion for a directed verdict" after this evidence was presented, heard Cicero's evidence, and then gave the government an opportunity to rebut that evidence, the trial judge followed the exact procedure described in *Griggs*. It may be that the trial judge followed the format outlined in *Griggs*, but it is the trial judge's treatment of the evidence before the court with which we find fault. The trial judge's discussion of the evidence provides support for both parties' positions on the ultimate issues of the case and we are not certain that all of the court's statements can be reconciled. What is clear, however, is that the trial judge based his ruling on his finding that the ordinances are facially neutral in that they apply to any person who does not live in Cicero regardless of race. TR. 344–45. For this reason, the trial judge's ruling was incorrect.

In *Griggs*, the Supreme Court held that under Title VII, "practices, procedures, or

tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminating employment practices." *Griggs*, 401 U.S. at 430, 91 S.Ct. at 853. The underlying purpose of allowing disparate impact claims is to address the consequences of employment practices regardless of whether they are facially neutral. *Id.* at 432, 91 S.Ct. at 854. The trial judge therefore erred by basing his decision to deny the injunction on the facial neutrality of the ordinances. Accordingly, we vacate his ruling.

Both parties have argued the evidence extensively on appeal in support of their positions and the government urges us to remand with instructions to the district court to grant its motion for a preliminary injunction. We will not address any of these arguments, however, because given the limited scope of the district court's ruling we do not wish to, in effect, try this case on appeal, and we therefore remand to the district court with instructions to consider the government's motion in accordance with the Supreme Court's holding in *Griggs*. We recognize that this may result in more delay than ruling on the merits of the motion ourselves and are mindful of the government's representations at oral argument that it desires as speedy a resolution of this case as possible to prevent further discrimination against persons who wish to apply for a job with the Town of Cicero. This desire for a speedy resolution, the government asserts, was its reason for moving for a preliminary injunction in the first place. It seems incongruous to us, however, that in view of this desire the government would bring this interlocutory appeal, which necessarily takes a good deal of time and entails the risk of a further appeal by the Town of Cicero if the government is successful on remand, rather than proceed directly to trial. We can only hope that further interlocutory appeals do not delay the ultimate resolution at trial of what the government considers to be an important case.

For the reasons stated above, the district court's denial of the government's motion for a preliminary injunction is VACATED and the case is REMANDED for proceedings consistent with the Supreme Court's decision in *Griggs v. Duke Power Co.*

POSNER, Circuit Judge, concurring and dissenting.

The denial of the government's motion for a preliminary injunction against the enforcement of these ordinances must be reversed for the reasons given by the majority, but since I think the government is entitled to the injunction I would remand with directions to issue it. The record compiled in the preliminary injunction hearing makes the strongest case for violation of Title VII on a "disparate impact" theory that I have seen in my four years of judging.

The majority's refusal to order the entry of the preliminary injunction rests on three propositions. The first is that we cannot order it without the benefit of the district court's views on a critical issue: whether the government is in fact likely to prevail on its disparate impact theory (an issue the district judge did not reach, because he did not understand the theory). Courts of appeals (including this court) have frequently held, in reviewing orders denying a preliminary injunction, that the plaintiff was entitled to the injunction. The clearest statement by this court is in *Atari, Inc. v. North American Philips Consumer Electronics Corp.*, 672 F.2d 607, 621 (7th Cir. 1982), where we said, "we reverse the district court's denial of plaintiffs' motion for a preliminary injunction and direct the district court to enter a preliminary injunction against continued infringement of plaintiffs' copyright." But there are many similar cases. See, e.g., *United Church of the Medical Center v. Medical Center Comm'n*, 689 F.2d 693 (7th Cir.1982); *Hanson Trust PLC v. ML SCM Acquisition Inc.*, 781 F.2d 264, 283 (2d Cir.1986); *City of Tenakee Springs v. Block*, 778 F.2d 1402, 1408 (9th Cir.1985); 11 Wright & Miller, Federal Practice and Procedure § 2962, at p. 638 (1973). Ordering the entry of the injunction, without the cost and

delay of a further proceeding on remand, is the proper course for us to follow when the plaintiff's entitlement is clear, and it is clear in this case. An additional consideration is that the judge who presided over this case in the district court has resigned; the case will be remanded to another judge, who will not be familiar with the record of the preliminary injunction hearing.

The second reason for the majority's refusal to direct the entry of a preliminary injunction now is that to do so would put us in the position of trying the case on an interlocutory appeal, thereby prejudicing the full trial on the merits, which is yet to be held. But whenever we consider the merits of the plaintiff's case as part of our review of an order granting or denying a preliminary injunction—as we must do in order to decide whether the district judge acted correctly, since the likelihood of the plaintiff's winning the case when it is tried is one of the criteria for granting or denying a preliminary injunction, see, e.g., *Brunswick Corp. v. Jones,* 784 F.2d 271, 273 (7th Cir.1986); *American Hospital Supply Corp. v. Hospital Products Ltd.,* 780 F.2d 589, 593 (7th Cir.1986), and is the decisive criterion here, as will appear—we give clues to our thoughts on the merits which may influence the judge when the case comes on for a full trial. This kind of "prejudice" is unavoidable.

The majority chides the government for having delayed the case by taking an interlocutory appeal from the denial of the preliminary injunction. But the government has a right to such an appeal, see 28 U.S.C. § 1292(a)(1), and there is no reason why the appeal should delay the trial. The district court retains jurisdiction of the case and can proceed to trial as quickly as it wants. The trial on the merits and the appeal from the grant or denial of a preliminary injunction proceed on parallel tracks. See 11 Wright & Miller, *supra,* § 2962, at p. 631.

I said that this is the strongest case for liability on a theory of disparate impact that I have seen and let me explain briefly why and thus make clear why we need not hesitate to order the preliminary injunction

entered. The town of Cicero, population 61,000, an urban working-class suburb of and immediately adjoining Chicago, has never had a black municipal employee. Granted, it has virtually no black residents, and the reasons for that surprising dearth (given the racial composition of adjoining communities) are not before us in this appeal. But almost 20 percent of the employees of its large private-sector employers are black, which is not surprising considering the racial makeup of Chicago and of the suburbs adjoining Cicero, and it is implausible that economic factors alone would explain the difference between the private-sector and public-sector employment of blacks in the town. Some public-sector jobs in Cicero may require credentials or qualifications possessed by few black people, but there is no evidence to this effect; and most public-sector jobs differ from private-sector jobs only in the identity of the employer.

Although the town presented its own statistical evidence, that evidence was worthless. A survey of American towns showed that a surprising number have no black employees, but the reasons for this phenomenon were not explored. Strangely, the survey placed Cicero fairly high in the ranks of "equal opportunity" public employers. Even though Cicero has never had a black public employee, the fraction of blacks in its population is lower than that of most towns which also have no black employees; hence the difference between the percentage of black employees (0%) and the percentage of black residents (.1%) was smaller than in those towns. But of course if these figures had been expressed as a ratio of the percentage of black employees to the percentage of black residents, Cicero would have ranked at the bottom as an equal opportunity employer, along with the other towns with no black employees. And all other objections to the study to one side, it assumed that the relevant labor pool was limited to residents of Cicero, though unless the town is a perfect circle with all its places of public employment in the exact center (which it isn't), some residents of adjacent towns, or of the adjacent portion

of Chicago, must live closer to such places of employment than some residents do. The town also presented evidence that most people like to live in racially and ethnically homogeneous communities. But this is a fact with little relevance once the pool of potential public employees is expanded beyond town residents, unless the fact is used to show that no blacks would move to Cicero if that were a condition of being employed by the town. I shall come back to the "move in" question.

Merely to show that economic factors do not explain why Cicero has no black public employees is not to show that the challenged ordinances are responsible for this condition; and without proof of causation there is no showing of disparate impact. Cf. *Lowe v. City of Monrovia*, 775 F.2d 998, 1004 (9th Cir.1985). But it is a fair guess that the ordinances are a cause, though maybe not the only one. It is possible that even if the ordinances did not exist and even if plenty of blacks were qualified for these jobs, they would not be able to land them, because of other forms of discrimination that are not before us on this appeal. But it is no defense to a discriminatory practice that it merely backs up other forms of discrimination. It is enough (to show disparate impact—not to show a violation of law, which would require consideration of the employer's defenses, and I will get to those in a moment) if the ordinances are a barrier to black employment, and they are. One of them requires that an applicant for fireman have lived in Cicero for three years, another that an applicant for policeman have lived there for three years, and the third (as interpreted) that any applicant for municipal employment have lived there for one year. Since virtually no blacks live in Cicero, virtually none is eligible to apply for a public job (of 29,000 working residents of Cicero, only 14 are black). If a black person who is not a resident of Cicero wanted to work as a policeman there, he would first have to move there, then work at some other job for three years, then apply for a job as a policeman. If he didn't get the job he might have wasted three years. Even a

requirement of residing for one year in Cicero before becoming eligible for a public job is a daunting one since the applicant can have no assurance that his application will be accepted. He might move to Cicero, and live there for a year, to no purpose at all.

Thus, given the virtual absence of blacks from Cicero's population, the ordinances operate to screen them out of public employment in the town. That may not be the purpose of the ordinances but an innocent purpose is no defense in a disparate-impact case. If the effect is to exclude blacks the ordinances are unlawful unless necessary to the efficient operation of the employer's enterprise, see, e.g., *Connecticut v. Teal*, 457 U.S. 440, 446, 102 S.Ct. 2525, 2530, 73 L.Ed.2d 130 (1982); *Aguilera v. Cook County Police & Corrections Merit Bd.*, 760 F.2d 844, 846–47 (7th Cir.1985), which these are not. This is clearest with respect to the municipal employees and the firemen. They can do their jobs fine without having lived in Cicero. You can type or file, answer the telephone or empty the wastebasket, process license applications or mail tax assessments, all without having lived in Cicero for a year, or for that matter a week; and you can put out fires without having lived there—there is nothing unusual about the building materials or design in Cicero. Although firemen must know how to get to the address of the fire quickly, it doesn't take long to learn directions in a compact urban area of 61,000; and even if the ordinance is not enforced, the fire department will not—not soon, anyway—come to consist entirely of nonresidents. The case of policemen is harder because knowledge of local customs and local people is important to the effective performance of a policeman's job. That might be a reason for giving some preference to old residents but is not a good reason for a rigid three-year residence requirement.

There are some jobs in government where such a requirement would be highly appropriate. See, e.g., *Sununu v. Stark*, 383 F.Supp. 1287 (D.N.H.1974) (three-judge

court), aff'd without opinion, 420 U.S. 958, 95 S.Ct. 1346, 43 L.Ed.2d 435 (1975). The mayor and other high officials of a town should know the town before they take office. But the ordinances challenged in this case make no such distinctions. They provide a threadbare justification for the total exclusion of black people from municipal employment.

A distinction must be made between residence at time of application and residence during employment. The former means that a person must move into the area before he can even apply for the job, the latter that he must move into the area after he gets the job. Although written in terms of residence at date of application, the ordinances challenged in this case have been assumed by all concerned to require that residence also be maintained during employment. Residence requirements of the "move in" variety are common and their constitutionality has been upheld, *McCarthy v. Philadelphia Civil Service Comm'n*, 424 U.S. 645, 96 S.Ct. 1154, 47 L.Ed.2d 366 (1976) (per curiam), though of course it doesn't follow that they are justifiable in all circumstances, regardless of racial impact. They rest on a desire to make sure that the employee has a personal stake in the performance of his public duties and to make him more available in emergencies—a particularly important consideration in the case of firemen and policemen. So if the Town of Cicero merely required its municipal employees to move into Cicero if and when they landed a public job there, it would have a stronger case. Moreover, such a requirement would be less exclusionary, because a black person wouldn't have to pull up stakes elsewhere and try to find a home in Cicero without knowing whether the move would lead to a job. Not only are the ordinances in this case more exclusionary but they rest on weaker justifications than a move-in requirement alone would: not the commitment and availability that come from living where you work but merely the greater knowledgeability—irrelevant to most jobs—of an old compared to a new resident. One of the town's defenses of the ordinances is that they will induce more spending in the town, to the benefit of its merchants. This is a somewhat parochial argument but in any event pertains to the move-in requirement rather than to the requirement of residence at date of application. A move-in requirement may increase the town's population and hence the amount of local spending; a requirement of residence at date of application for employment will limit population growth by establishing a barrier to moving in, for it will reduce a new resident's job opportunities.

On the record before us, the government has established an overwhelming probability of prevailing on the merits when this case is tried. Probably no more is required to entitle the government to a preliminary injunction under a statute that expressly authorizes it to seek such relief, as 42 U.S.C. § 2000e-6(a) does. See *Illinois Bell Tel. Co. v. Illinois Commerce Comm'n*, 740 F.2d 566, 571 (7th Cir.1984); *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423 (11th Cir.1984). If more is required, as held in *Moteles v. University of Pennsylvania*, 730 F.2d 913, 917 (3d Cir.1984)—if the government must also show irreparable harm—it has shown it here. The black people whom these ordinances exclude from public employment in Cicero cannot be identified, hence cannot be made whole by an award of damages. Therefore, any delay in granting relief against the ordinances will or at least may impose uncompensated delays; and no more need be shown to comply with a threshold requirement of proving irreparable harm.

I grant that even if, as our cases suggest, the government need not show irreparable harm to get an injunction in a case such as this, the town ought to be allowed to resist the entry of the injunction by showing that it would cause much greater irreparable harm to itself. But the town is unlikely to suffer irreparable harm comparable to that of potential black applicants for public employment, merely by not being allowed to enforce the ordinances while this lawsuit is pending. If the town does hire some nonresidents during this period,

it can fire them if the ordinances eventually are upheld; any damage to the efficiency of the town's government that the nonresidents might do in the interim by virtue of their lack of first-hand knowledge of the town will be insignificant. Even assuming that the irreparable harm to the town were as great as that to the government suing as the representative of potential black applicants for municipal employment, the strong likelihood of the government's winning the case when it is tried would tip the balance in favor of a preliminary injunction, always assuming that the usual criteria for granting or denying preliminary injunctions are applicable to a case such as this. *American Hospital Supply Corp. v. Hospital Products Ltd., supra,* 780 F.2d at 598.

I admit that the injunction may have little effect. Few blacks will feel secure in applying for a job that they may get only to lose should the government lose the case on the merits. And they may face subtle and not-so-subtle barriers to moving into Cicero; since the government does not challenge the "move in" requirement that everyone assumes is implicit in the ordinances, any successful black applicant for public employment in Cicero would have to move into the town, and maybe he would find this hard to do, or unattractive. But all that this means is that the irreparable harm to both parties may be small; it does not alter the balance of equities. Of course the government would have no equity in pressing for a futile order. But the preliminary injunction that it seeks is not so certain to be a futile gesture that it can properly be withheld on that ground. Anyway, futility is neither a ground of the majority's declining to order the entry of the injunction now, nor a ground urged by the Town of Cicero.

In sum, I agree that we should reverse but I would go further than the majority and order the district court to grant the preliminary injunction forthwith. It goes without saying that the town should have an opportunity to convince the district court that the facts are otherwise than they appear on the basis of the hearing on

the government's motion for a preliminary injunction. But it will get that opportunity in the trial on the merits. On the present record, the government's entitlement to the temporary relief that it has sought is sufficiently established to warrant our directing the entry of a preliminary injunction.